715 S.E.2d 405

James D. MacDONALD and Debbie MacDonald, his Wife, Plaintiffs Below, Appellants

v.

CITY HOSPITAL, INC., and Sayeed Ahmed, M.D., Defendants Below, Appellees.

No. 35543.

Supreme Court of Appeals of West Virginia.

Submitted March 8, 2011.

Decided June 22, 2011.

D. Michael Burke, Esq., Burke, Schultz, Harman & Jenkinson, Martinsburg, WV, and Barry J. Nace, Esq., Christopher T. Nace, Esq., Paulson & Nace, Robert S. Peck, Esq., Center for Constitutional Litigation, P.C., Washington, D.C., for Appellants, James and Debbie MacDonald.

Ancil G. Ramey, Esq., Hannah B. Curry, Esq., Steptoe & Johnson PLLC, Charleston, WV, and Stephen R. Brooks, Esq., Flaherty, Sensabaugh Bonasso PLLC, Morgantown, WV, for Appellee, Sayeed Ahmed, M.D.

Harry G. Deitzler, Esq., Hill, Peterson, Carper, Bee & Deitzler, PLLC, and Troy N. Giatras, Esq. Stacy A. Jacques, Esq. The Giatras Law Firm, PLLC Charleston, WV, for Amicus Curiae, Public Justice, P.C.

Thomas P. Maroney, Esq., Maroney, Williams, Weaver, & Pancake, PLLC, Charleston, WV, for Amicus Curiae, West Virginia Labor Federation, AFL–CIO.

Charles R. Bailey, Esq., Brian D. Morrison, Esq., James W. Marshall, III, Esq., Bailey & Wyant, PLLC, Charleston, WV, for Amicus Curiae, West Virginia Board of Risk & Insurance Management.

Brenda Nichols Harper, Esq., Charleston, WV, for Amicus Curiae, West Virginia Chamber of Commerce.

Michael J. Farrell, Esq., Tamela J. White, Esq., David A. Stackpole, Esq., Farrell, Farrell & Farrell, PLLC, Huntington, WV, for Amicus Curiae, West Virginia Mutual Insurance Company.

Mychal S. Schultz, Esq., Jeffrey A. Foster, Esq., Dinsmore & Shohl LLP, Charleston, WV, for Amicus Curiae, Defense Trial Counsel of West Virginia.

Mark A. Behrens, Esq., Cary Silverman, Esq., Shook, Hardy & Bacon L.L.P., Washington, D.C., and Evan H. Jenkins, Esq., Charleston, WV, for Amici Curiae, West Virginia State Medical Association, Component Societies of the West Virginia State Medical Association, West Virginia Academy of Family Physicians, West Virginia Hospital Association, American Medical Association, West Virginia Orthopaedic Society, West Virginia Chapter American Academy of Pediatrics, West Virginia Academy of Otolaryngology— Head and Neck Surgery, Inc., West Virginia Podiatric Medical Association, West Virginia Medical Group Management Association, West Virginia Radiological Society, West Virginia State Neurosurgical Society, Health Coalition on Liability and Access, Physicians Insurers Association of America, American Insurance Association, Property Casualty Insurers Association of America, and NFIB Small Business Legal Center.

WORKMAN, Chief Justice:

Once again, this Court is asked to consider the constitutionality, *vel non*, of W. Va.Code § 55–7B–8 which places a limit or "cap" on compensatory damages for noneconomic loss awarded in a medical professional liability action. On two prior occasions, in the cases of *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991) and *Verba v. Ghaphery*, 210 W.Va. 30, 552 S.E.2d 406 (2001), this Court upheld the constitutionality of the cap which was set at $1,000,000. Since *Robinson* and *Verba* were decided, the Legislature amended W. Va. Code § 55–7B–8 and lowered the cap. The statute now provides, in pertinent part:

(a) In any professional liability action brought against a health care provider pursuant to this article, the maximum amount recoverable as compensatory damages for noneconomic loss shall not exceed two hundred fifty thousand dollars per occurrence, regardless of the number of plaintiffs or the number of defendants or, in the case of wrongful death, regardless of the number of distributees, except as provided in subsection (b) of this section.

(b) The plaintiff may recover compensatory damages for noneconomic loss in excess of the limitation described in subsection (a) of this section, but not in excess of five hundred thousand dollars for each occurrence, regardless of the number of plaintiffs or the number of defendants or, in the case of wrongful death, regardless of the number of distributees, where the damages for noneconomic losses suffered by the plaintiff were for: (1) Wrongful death; (2) permanent and substantial physical deformity, loss of use of a limb or loss of a bodily organ system; or (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life sustaining activities.

W. Va.Code § 55–7B–8 (2003) (Repl.Vol. 2008).[1]

In this case, the jury returned a verdict in favor of the appellants and plaintiffs below, James D. MacDonald and Debbie MacDonald, which included an award of $1,500,000 for noneconomic loss.[2] In accordance with W. Va.Code § 55–7B–8, the circuit court reduced the noneconomic damages award to $500,000, finding that Mr. MacDonald suffered a permanent and substantial physical deformity warranting application of the higher cap amount. The MacDonalds contend in this appeal that the cap contained in W. Va.Code § 55–7B–8 is unconstitutional, and therefore, the circuit court erred in reducing the jury's verdict. The appellees and defendants below, Sayeed Ahmed, M.D., and City Hospital, Inc., assert a cross-assignment of error, arguing that the $250,000 cap should have been applied in this case. City Hospital also cross assigns as error the circuit court's denial of its motion for summary judgment, motion for judgment as a matter of law, and motion for a new trial.

Upon consideration of the briefs[3] and oral argument, the record submitted, and the per-

---

1. It is noted at this juncture that W. Va.Code § 55–7B–8(c) provides for the caps to be increased each year beginning on January 1, 2004, by an amount equal to the consumer price index published by the United States Department of Labor. According to the appellants, the caps increased to $288,527 and $577,054 in 2010. For simplicity of discussion, however, the statutory amounts of $250,000 and $500,000 will be referenced in this opinion.

2. W. Va.Code § 55–7B–2(k) (2003) (Repl.Vol. 2008) defines "noneconomic loss" as "losses, including, but not limited to, pain, suffering, mental anguish and grief." This statute was amended in 2006, but the definition of noneconomic loss remained the same.

3. This Court wishes to acknowledge and express appreciation for the contributions of the amici curiae. Separate briefs supporting the appellants were filed by Public Justice, P.C.; the West Virginia Association for Justice; and the West Virginia Labor Federation, AFL–CIO. In support of the appellees, separate briefs were submitted by the West Virginia Board of Risk & Insurance Management; West Virginia Chamber of Commerce; West Virginia Mutual Insurance Company; and Defense Trial Counsel of West Virginia; and a joint brief was filed by the West Virginia State Medical Association; Component Societies of the West Virginia State Medical Association; West Virginia Academy of Family Physicians; West Virginia Hospital Association; American Medical Association; West Virginia Orthopaedic Society; West Virginia Chapter American Academy of Pediatrics; West Virginia Academy of Otolaryngology—Head and Neck Surgery, Inc.; West Virginia Podiatric Medical

tinent authorities, this Court concludes that W. Va.Code § 55–7B–8 as amended in 2003 is constitutional. We further conclude that the circuit court did not err in applying the $500,000 cap pursuant to W. Va.Code § 55–7B–8(b) or in denying the motions for summary judgment, judgment as a matter of law, and a new trial filed by City Hospital. Accordingly, for the reasons set forth below, the final order is affirmed.

## I.

## FACTS

This case arises out of medical treatment provided to Mr. MacDonald by Dr. Ahmed while he was a patient at City Hospital. Mr. MacDonald was suffering from symptoms consistent with pneumonia when he was admitted to City Hospital on October 29, 2004. Mr. MacDonald had a significant medical history as childhood diabetes had led to organ damage requiring him to undergo a kidney transplant in 1988. According to Mr. MacDonald, he developed rhabdomyolysis, a severe form of muscle damage, as a result of being given the combination of Lipitor, Diflucan, and Cyclosporin during his stay at City Hospital in 2004.

On February 16, 2007, Mr. MacDonald, and his wife, Debbie MacDonald, filed this medical professional liability action in the Circuit Court of Berkeley County contending that Dr. Ahmed should not have administered certain drugs given Mr. MacDonald's medical history or that some of the medications should have been discontinued based upon blood testing during his stay at City Hospital. With respect to City Hospital, the MacDonalds asserted that the hospital pharmacy should have alerted Dr. Ahmed of the possible negative interactions of the medications he was prescribing for Mr. Mac-

Donald. The MacDonalds alleged that as a result of the negligence of Dr. Ahmed and City Hospital, Mr. MacDonald suffered serious and permanent injuries. Mrs. MacDonald asserted a claim for loss of consortium.

At trial, both liability and damages were contested. The appellees presented evidence that there are causes of rhabdomyolysis other than drug interaction. Dr. Ahmed also testified that he had used the same drugs to successfully treat Mr. MacDonald for the same condition in 2003.[4] Dr. Ahmed stated that he was well aware of Mr. MacDonald's medical history and that he knew that adding antifungal drugs to Mr. MacDonald's regimen created a slightly elevated risk of rhabdomyolysis but the only way to treat his fungal lung infection was with an antifungal drug, particularly after Mr. MacDonald's lung problems became so grave on his second day of hospitalization that he had to be moved to intensive care and placed on a ventilator. City Hospital asserted that its pharmacists ran each of the changes in Mr. MacDonald's medications through a computer program to make certain there would be no negative interactions. City Hospital also claimed that the side effects of the medication Mr. MacDonald was taking had been explained to him.

According to Mr. MacDonald, he suffered damage to the muscles in his legs which required a period of rehabilitation and physical therapy after he was discharged from the hospital[5] in order to regain the ability to walk. Mr. MacDonald testified at trial that he still suffers from severe muscle weakness and has "balance" issues with his lower body. During cross-examination, however, Mr. MacDonald testified that he could paint his house, operate a vacuum, prepare meals, and engage in other household activities. He

Association; West Virginia Medical Group Management Association; West Virginia Radiological Society; West Virginia State Neurosurgical Society; Health Coalition on Liability and Access; Physicians Insurers Association of America; American Insurance Association; Property Casualty Insurers Association of America; and NFIB Small Business Legal Center.

4. Mr. MacDonald was admitted to City Hospital in May 2003 with the same symptoms as he

presented with in 2004. During his 2003 hospital stay, Mr. MacDonald required treatment with multiple antibiotics, admission into the intensive care unit, and intubation.

5. At some point during his course of treatment, Mr. MacDonald's wife had him transferred from City Hospital to another hospital located in Winchester, Virginia, where the diagnosis of rhabdomyolysis was made.

also acknowledged that he could walk on a treadmill and operate a motor vehicle. Following his 2004 hospitalization, Mr. MacDonald returned to substitute teaching and worked as a bagger at a local grocery store.[6]

The case was tried before a jury in the Circuit Court of Berkeley County from November 17, 2008, to November 25, 2008. The jury returned a verdict finding that both appellees breached the standard of care and proximately caused Mr. MacDonald's injuries, apportioning seventy percent fault to Dr. Ahmed and thirty percent fault to City Hospital. The damages awarded were as follows: $92,000 for past reasonable and necessary medical expenses; $37,000 for past lost wages; $250,000 for Mr. MacDonald's past pain and suffering; $750,000 for Mr. MacDonald's future pain and suffering; and $500,000 for Mrs. MacDonald for loss of consortium.

Following the verdict, the trial court reduced the non-economic damages award to $500,000 in accordance with W. Va.Code § 55–7B–8(b), finding that Mr. MacDonald satisfied the criteria for application of the $500,000 cap. Post-trial motions were filed by all parties. The appellants challenged the constitutionality of W. Va.Code § 55–7B–8 while the appellees sought a new trial. The motions were denied, and this appeal followed.

## II.

### STANDARD OF REVIEW

"Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). Likewise, "[c]onstitutional challenges relating to a statute are reviewed pursuant to a *de novo* standard of review." *Morris v. Crown Equip. Corp.*, 219 W.Va. 347, 352, 633 S.E.2d 292, 297 (2006).

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965). *See also* Syllabus Point 3, *Willis v. O'Brien*, 151 W.Va. 628, 153 S.E.2d 178, (1967) ("When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment.").

The *de novo* standard of review also applies to a circuit court's ruling on a motion for summary judgment. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). With respect to a motion for judgment as a matter of law, Syllabus Point 2 of *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009), holds,

When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to

6. Mr. MacDonald retired from his position as a school teacher prior to his hospitalization in 2004. At the time of trial, he was sixty-eight years old.

determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party. Finally, it is well-established that " '[a]lthough the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syllabus point 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976)." Syllabus Point 3, *Carpenter v. Luke*, 225 W.Va. 35, 689 S.E.2d 247 (2009). In other words, our standard of review for a trial court's decision regarding a motion for a new trial is abuse of discretion. *Marsch v. American Elec. Power Co.*, 207 W.Va. 174, 180, 530 S.E.2d 173, 179 (1999). With these standards in mind, the assignments of error presented in this case will now be considered.

### III.

### DISCUSSION

As set forth above, there are three issues presented in this appeal: the constitutionality of W. Va.Code § 55–7B–8; the application of the $500,000 cap; and the circuit court's denial of motions made by City Hospital for summary judgment, for judgment as a matter of law, and for a new trial. Each assignment of error will be discussed, in turn, below.

#### A. Constitutionality of W. Va.Code § 55–7B–8

As noted above, this Court first considered the constitutionality of W. Va.Code § 55–7B–8 in *Robinson v. Charleston Area Medical Center, Inc.*, 186 W.Va. 720, 414 S.E.2d 877 (1991), and then was asked to reconsider the same in *Verba v. Ghaphery*, 210 W.Va. 30, 552 S.E.2d 406 (2001). In Syllabus Point 5 of *Robinson*, this Court held:

W.Va.Code, 55–7B–8, as amended, which provides a $1,000,000 limit or "cap" on the amount recoverable for a noneconomic loss in a medical professional liability action is constitutional. It does not violate the state constitutional equal protection, special legislation, state constitutional substantive due process, "certain remedy," or right to jury trial provisions. *W.Va. Const.* art. III, § 10; *W.Va. Const.* art. VI, § 39; *W.Va. Const.* art. III, § 10; *W.Va. Const.* art. III, § 17; and *W.Va. Const.* art. III, § 13, respectively.

In *Verba*, this Court, "[f]inding no palpable mistake or error in *Robinson*," refused to revisit the constitutional issues previously considered based upon

the judicial doctrine of *stare decisis* which rests on the principle[ ] that law by which men are governed should be fixed, definite, and known, and that, when the law is declared by court of competent jurisdiction authorized to construe it, such declaration, in absence of palpable mistake or error, is itself evidence of the law until changed by competent authority.

210 W.Va. at 34, 552 S.E.2d at 410 (citation omitted). This Court, however, did consider in *Verba* whether the cap violated the "separation of powers" doctrine, as that claim had not been specifically addressed in *Robinson*. *Id.* at 35, 552 S.E.2d at 411. It was ultimately concluded in *Verba* that there was no violation of separation of powers because Article VIII, Section 13 of the Constitution of West Virginia [7] authorizes the Legislature to enact statutes that abrogate the common law which includes the power to "set reasonable limits on recoverable damages in civil causes of action." *Id. See also* Syllabus, *Perry v. Twentieth St. Bank*, 157 W.Va. 963, 206 S.E.2d 421 (1974).

In this appeal, the MacDonalds assert the same constitutional challenges previously considered in *Robinson* and *Verba*; in particular, they contend that the statute vio-

**7.** Article VIII, Section 13 of the Constitution of West Virginia states:

Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this state until altered or repealed by the legislature.

lates the equal protection,[8] prohibition on special legislation,[9] right to trial by jury,[10] separation of powers,[11] and "certain remedy"[12] provisions of the Constitution of West Virginia. The MacDonalds argue that because the cap has now been lowered to $250,000 or $500,000, depending on the severity of the injury, this Court's decisions in *Robinson* and *Verba* must be revisited. In making this argument, the MacDonalds rely upon *dicta* from *Robinson* which suggested,

> "[A]ny modification the legislature [would] make[ ] is subject to being stricken as unconstitutional. A reduction of non[economic] damages to a lesser cap *at some point* would be manifestly so insufficient as to become a denial of justice[,]" under, for example, the state constitutional equal protection or "certain remedy" provisions. *Lucas v. United States,* 757 S.W.2d 687, 700 (Tex.1988) (Gonzales, J., dissenting).

186 W.Va. at 730, 414 S.E.2d at 887 (emphasis added). Nothing in that *dicta* or the substance of the opinion, however, specified exactly what that point is, nor did it establish any criteria for making that determination. Also, as previously noted, the statute, as amended in 2003, does not provide a blanket limitation of $250,000/$500,000; rather, W. Va.Code § 55–7B–8(c) provides that the cap amounts "shall increase [each year] to account for inflation by an amount equal to the consumer price index published by the United States Department of Labor, up to fifty percent of the amounts specified ... as a limitation of compensatory noneconomic damages." In addition, unlike the 1986 statute, W. Va.Code § 55–7B–8(d) now requires that in order for a health care provider to receive the benefit of the cap, such provider must have medical professional liability insurance in the amount of at least $1,000,000 per occurrence covering the medical injury which is the subject of the action.

Upon careful consideration and review, we find no basis to conclude that the amendments to W. Va.Code § 55–7B–8 enacted by the Legislature in 2003 have rendered the statute unconstitutional, and therefore, for the reasons set forth below, affirm the circuit court's decision on this issue.

■ **1. Right to trial by jury.** First, the fact that the cap has been lowered has no impact on our previous analysis as it pertains to the constitutional right to trial by jury. In *Robinson,* this Court explained that

> [a] legislature adopting a prospective rule of law that limits all claims for pain and suffering in all cases is not acting as a fact finder in a legal controversy. It is acting permissibly within its legislative powers that entitle it to create and repeal causes

---

8. "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syllabus Point 4, *Israel, by Israel v. West Virginia Secondary Schools Activities Comm'n,* 182 W.Va. 454, 388 S.E.2d 480 (1989). It states: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." W. Va. Const. art. III, § 10.

9. Article VI, Section 39 of the Constitution of West Virginia prohibits the Legislature from enacting special laws "[r]egulating the practice in courts of justice," *inter alia,* and further states that "[t]he legislature shall provide, by general laws, for the foregoing and all other cases for which provision can be so made; and in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case, nor in any other case in which the courts have jurisdiction, and are competent to give the relief asked for."

10. Article III, Section 13 of the Constitution of West Virginia provides, in pertinent part:

> In suits at common law, ... the right of trial by jury, if required by either party, shall be preserved.... No fact tried by a jury shall be otherwise reexamined in any case than according to the rule of court or law.

11. Article V, Section 1 of the West Virginia Constitution states:

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature..

12. Article III, Section 17 of the Constitution of West Virginia requires:

> The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

of action. The right of jury trials in cases at law is not impacted. Juries always find facts on a matrix of laws given to them by the legislature and by precedent, and it can hardly be argued that limitations imposed by law are a usurpation of the jury function[.]

186 W.Va. at 731, 414 S.E.2d at 888 (quoting *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1331–32 (D.Md.1989)). Nonetheless, the MacDonalds maintain in this appeal that the jury's determination of damages was "rendered advisory" as a result of the statutory cap, and therefore, their right to trial by jury was violated. In support of their argument, the MacDonalds rely upon a recent decision issued by the Georgia Supreme Court. In *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 691 S.E.2d 218 (2010), the Court invalidated a $350,000 cap on noneconomic damages in medical malpractice cases concluding that "while we have held that the Legislature generally has the authority to define, limit, and modify available legal remedies ... the exercise of such authority simply cannot stand when the resulting legislation violates the constitutional right to jury trial." 691 S.E.2d at 224.

Upon review, it is clear that the MacDonalds' reliance on the *Nestlehutt* decision is misplaced. "[T]he Georgia Constitution states plainly that 'the right to trial by jury shall remain inviolate.'" *Id.* at 221 (quoting Ga. Const. of 1983, Art. 1, Sec. 1, Par. XI(a)). Our state constitutional provision regarding the right to trial by jury differs substantially,[13] and accordingly, the Georgia court's analysis is not persuasive.[14] In *Robinson*, this Court concluded "the predetermined, legislative limit on the recoverable amount of a noneconomic loss in a medical professional liability action does not violate the 'reexamination' clause of such jury trial provision." 186 W.Va. at 731, 414 S.E.2d at 888. Consequently, Syllabus Point 4 of *Robinson* states:

The language of the "reexamination" clause of the constitutional right to a jury

trial, *W.Va. Const.* art. III, § 13, does not apply to the legislature, fixing in advance the amount of recoverable damages in all cases of the same type, but, instead, applies only to the judiciary, acting "in any [particular] case[.]"

Accordingly, we find no merit to the MacDonalds' argument.

**2. Separation of powers.** We likewise find no merit to the MacDonalds' contention that the cap violates the principle of separation of powers. Again, the Legislature's decision to reduce the cap has no impact on our prior analysis of this issue. As this Court concluded in *Verba*, establishing the amount of damages recoverable in a civil action is within the Legislature's authority to abrogate the common law. We reasoned " 'that if the legislature can, without violating separation of powers principles, establish statutes of limitation, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit noneconomic damages without violating the separations of powers doctrine[.]' " 210 W.Va. at 35, 552 S.E.2d at 411 (quoting *Edmonds v. Murphy*, 83 Md.App. 133, 149, 573 A.2d 853, 861 (1990)).

**3. Equal protection and special legislation.** We now turn to the MacDonalds' equal protection and special legislation argument. "Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. The claimed discrimination must be a product of state action as distinguished from a purely private activity." Syllabus Point 2, *Israel, by Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989). With respect to an equal protection challenge, this Court has held:

" 'Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper

---

**13.** *See* note 10, *supra*.

**14.** Even the Georgia Supreme Court recognized that other jurisdictions with less comprehensive right to jury trial provisions have reached the

opposite conclusion regarding the constitutionality of damage caps. *Nestlehutt*, 691 S.E.2d at 224–25 n. 8.

governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause.' Syllabus Point 7, [as modified,] *Atchinson v. Erwin,* [172] W.Va. [8], 302 S.E.2d 78 (1983)." Syllabus Point 4, as modified, *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery Co.,* [174] W.Va. [538], 328 S.E.2d 144 (1984).

Syllabus Point 4, *Gibson v. West Virginia Dep't of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991).

 The MacDonalds argue that the statute, as amended, is not a rational response to "social, economic, historic or geographic factors," as they assert that West Virginia was not suffering from a "loss" of physicians to other states and that West Virginia was not suffering from a growing malpractice litigation problem when the amendments to W. Va.Code § 55–7B–8 were enacted. The MacDonalds also contend that malpractice claims and awards were actually declining at that time and were not the reason why the cost of liability insurance coverage "continued to rise dramatically." In other words, the MacDonalds maintain that the statute, as amended, fails the rational basis test because there was no factual basis for the Legislature to conclude that lowering the cap from $1,000,000 to $250,000, or $500,000 in certain cases, would accomplish the legislative goals of attracting and keeping physicians in West Virginia and reducing medical malpractice premiums.[15]

 In support of their argument, the MacDonalds and the amici curiae supporting them have presented this Court with several charts and graphs which they say illustrate that the Legislature's reasoning for reducing the cap on noneconomic damages was flawed. Unsurprisingly, Dr. Ahmed and City Hospital, as well as the amici curiae participating on their behalf, have responded with their own copious statistics. While we appreciate the efforts of all parties involved, "courts ordinarily will not reexamine independently the factual basis for the legislative justification for a statute." *Robinson,* 186 W.Va. at 730, 414 S.E.2d at 887. Moreover, "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 692, 408 S.E.2d 634, 642 (1991). Consequently, "the inquiry is whether the legislature reasonably could conceive to be true the facts on which the challenged statute was based." *Robinson,* 186 W.Va. at 730, 414 S.E.2d at 887.

The previous $1,000,000 cap on noneconomic damages was part of the West Virginia Medical Professional Liability Act of 1986, W. Va.Code §§ 55–7B–1 to –11 (hereinafter "the Act"). As explained in *Robinson,*

> The legislature found that in recent years the cost of professional liability insurance for health care providers has risen dramatically and that the nature and extent of coverage concomitantly has diminished, to the detriment of the injured and health care providers. Therefore, to provide for a comprehensive, integrated resolution, the legislature determined that reforms in three areas must be enacted together: in (1) the common-law and statutory rights of the citizens to compensation for injury or death in medical professional liability cases; in (2) the regulation of rate making

---

15. At the outset of their equal protection argument, the MacDonalds urge this Court to employ a strict scrutiny analysis or, at least, an intermediate level of protection. However, strict scrutiny is only utilized when the classification involves a fundamental, constitutional right, and the intermediate level of protection is accorded classifications such as those which are gender-based. *Marcus v. Holley,* 217 W.Va. 508, 523, 618 S.E.2d 517, 532 (2005). In *Robinson,* this Court explained that "the right to bring a tort action for damages, even though there is court action for damages, even though there is court involvement, is economically based and is not a 'fundamental right' for 'certain remedy' or state constitutional equal protection purposes." 186 W.Va. at 728–29, 414 S.E.2d at 885–86. Therefore, we concluded that "the 'rational basis' test for state constitutional equal protection purposes is applicable in this jurisdiction to statutory abrogation of certain common-law causes of action or to statutory limitation on remedies in certain common-law causes of action, such as statutory 'caps' on the recoverable amount of damages." *Id.* at 729, 414 S.E.2d at 886.

and other health care liability insurance industry practices; and in (3) the authority of medical licensing boards to regulate effectively and to discipline health care providers.

186 W.Va. at 724, 414 S.E.2d at 881 (citations omitted). The legislature set forth a detailed explanation of its findings and the purpose of the Act in W. Va.Code § 55–7B–1 (1986).[16] In enacting the amendments to the Act in 2003, the Legislature added the following to the legislative findings and declaration of purpose:

> That the unpredictable nature of traumatic injury health care services often result in a greater likelihood of unsatisfactory patient outcomes, a higher degree of patient and patient family dissatisfaction and frequent malpractice claims, creating a financial strain on the trauma care system of our state, increasing costs for all users of the trauma care system and impacting the availability of these services, requires appropriate and balanced limitations on the rights of persons asserting claims against trauma care health care providers, this balance must guarantee availability of trauma care services while mandating that these services meet all national standards of care, to assure that our health care resources are being directed towards providing the best trauma care available; and

> That the cost of liability insurance coverage has continued to rise dramatically, resulting in the state's loss and threatened loss of physicians, which, together with other costs and taxation incurred by health care providers in this state, have created a competitive disadvantage in attracting and retaining qualified physicians and other health care providers.

The Legislature further finds that medical liability issues have reached critical proportions for the state's long-term health care facilities, as: (1) Medical liability insurance premiums for nursing homes in West Virginia continue to increase and the number of claims per bed has increased significantly; (2) the cost to the state Medicaid program as a result of such

---

**16.** W. Va.Code § 55–7B–1 (1986) provided in its entirety:

> The Legislature hereby finds and declares that the citizens of this state are entitled to the best medical care and facilities available and that health care providers offer an essential and basic service which requires that the public policy of this state encourage and facilitate the provision of such service to our citizens:

> That as in every human endeavor the possibility of injury or death from negligent conduct commands that protection of the public served by health care providers be recognized as an important state interest;

> That our system of litigation is an essential component of this state's interest in providing adequate and reasonable compensation to those persons who suffer from injury or death as a result of professional negligence;

> That liability insurance is a key part of our system of litigation, affording compensation to the injured while fulfilling the need and fairness of spreading the cost of the risks of injury;

> That a further important component of these protections is the capacity and willingness of health care providers to monitor and effectively control their professional competency, so as to protect the public and ensure to the extent possible the highest quality of care;

> That it is the duty and responsibility of the Legislature to balance the rights of our individual citizens to adequate and reasonable compensation with the broad public interest in the provision of services by qualified health care providers who can themselves obtain the protection of reasonably priced and extensive liability coverage;

> That in recent years, the cost of insurance coverage has risen dramatically while the nature and extent of coverage has diminished, leaving the health care providers and the injured without the full benefit of professional liability insurance coverage;

> That many of the factors and reasons contributing to the increased cost and diminished availability of professional liability insurance arise from the historic inability of this state to effectively and fairly regulate the insurance industry so as to guarantee our citizens that rates are appropriate, that purchasers of insurance coverage are not treated arbitrarily, and that rates reflect the competency and experience of the insured health care providers.

> Therefore, the purpose of this enactment is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth above. In so doing, the Legislature has determined that reforms in the common law and statutory rights of our citizens to compensation for injury and death, in the regulation of rate making and other practices by the liability insurance industry, and in the authority of medical licensing boards to effectively regulate and discipline the health care providers under such board must be enacted together as necessary and mutual ingredients of the appropriate legislative response.

higher premiums has grown considerably in this period; (3) current medical liability premium costs for some nursing homes constitute a significant percentage of the amount of coverage; (4) these high costs are leading some facilities to consider dropping medical liability insurance coverage altogether; and (5) the medical liability insurance crisis for nursing homes may soon result in a reduction of the number of beds available to citizens in need of long-term care.

W. Va.Code § 55–7B–1 (2003) (Repl.Vol. 2008).[17]

Upon review, we find that the Legislature could have reasonably conceived to be true the facts on which the amendments to the Act, including the cap on noneconomic damages in W. Va.Code § 55–7B–8, were based. The Legislature could have rationally believed that decreasing the cap on noneconomic damages would reduce rising medical malpractice premiums and, in turn, prevent physicians from leaving the state thereby increasing the quality of, and access to, healthcare for West Virginia residents. While one or more members of the majority may differ with the legislative reasoning, it is not our prerogative to substitute our judgment for that of the Legislature, so long as the classification is rational and bears a reasonable relationship to a proper governmental purpose. Further, even though the cap now contained in W. Va.Code § 55–7B–8 is significantly less than the original $1,000,000 amount, we cannot say that it is on its face arbitrary or capricious.

Several other jurisdictions have also concluded that controlling malpractice insurances costs, and in turn healthcare costs, through the enactment of a cap on noneconomic damages is a legislative policy choice that cannot be second-guessed by courts, but rather, must be upheld as rationally-related to a legitimate government purpose. For example, the Supreme Court of Alaska, upholding a cap on the amount of noneconomic damages that could be awarded in tort actions for personal injury and wrongful death, stated:

We decline the plaintiffs' invitation to second-guess the legislature's factual findings. After examining various evidence and testimony, the legislature found that there were problems with tort litigation that needed to be solved, including frivolous litigation, excessive damages awards, and increased costs for malpractice and other liability insurance. The plaintiffs, pointing to other contrary evidence, ask us to independently review this conclusion and find that the evidence instead showed that these problems did not really exist. The plaintiffs ask us to delve into questions of policy formulation that are best left to the legislature. As we have noted previously, "[i]t is not a court's role to decide whether a particular statute or ordinance is a wise one; the choice between competing notions of public policy is to be made by elected representatives of the people."

. . . .

The plaintiffs allege that much of the evidence presented to the legislature was false or misleading and they invite us to examine contrasting evidence and impeachment evidence, arguing that the legislature should not be allowed "to do whatever it wishes regardless of the factual basis for legislative action." However, that weighing of the evidence is a task that

---

17. In amending this statute, the Legislature also revised the final paragraph of W. Va.Code § 55–7B–1 to read as follows:

Therefore, the purpose of this article is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth in this section. In so doing, the Legislature has determined that reforms in the common law and statutory rights of our citizens must be enacted together as necessary and mutual ingredients of the appropriate legislative response relating to:

(1) Compensation for injury and death;

(2) The regulation of rate making and other practices by the liability insurance industry, including the formation of a physicians' mutual insurance company and establishment of a fund to assure adequate compensation to victims of malpractice; and

(3) The authority of medical licensing boards to effectively regulate and discipline the health care providers under such board.

is properly left to the legislature. The "substantial relationship" requirement was met in this case.

*Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1053, 1055 (Alaska 2002) (footnote and citation omitted).[18]

Similarly, the Supreme Court of Utah advised in *Judd v. Drezga,* 103 P.3d 135, 140 (Utah 2004):

Our job as this state's court of last resort is to determine whether the legislature overstepped the bounds of its constitutional authority in enacting the cap on quality of life damages, not whether it made wise policy in doing so. Although there are indications that overall health care costs may only be minimally affected by large damage awards, there is also data that indicates otherwise. *See, e.g., Lee v. Gaufin,* 867 P.2d 572, 585–89 (Utah 1993) (noting pricing and investment decisions by insurers, inflation, etc., as factors contributing to increased health care costs). *But see* Office of Tech. Assessment OTA–BP–H–1 19, *Impact of Legal Reforms on Medical Malpractice Costs* 64 (1993) [hereinafter *Impact of Legal Reforms* ] (recognizing that "caps on damage awards were the only type of State tort reform that consistently showed significant results in reducing the malpractice cost indicators"). When an issue is fairly debatable, we cannot say that the legislature overstepped its constitutional bounds when it determined that there was a crisis needing a remedy....

. . . .

We cannot conclude that the cap on quality of life damages is arbitrary or unreasonable. The legislature's determination that it needed to respond to the perceived medical malpractice crisis was logically followed by action designed to control costs. Although malpractice insurance rates may not be entirely controlled by such matters, they are undoubtedly subject to some measure of fluctuation based on paid claims. *Impact of Legal Reforms, supra,* at 73 (noting that "caps on damages ... lead to lower insurance premiums"). Thus, one nonarbitrary manner of controlling such costs is to limit amounts paid out. Intuitively, the greater the amount paid on claims, the greater the increase in premiums. Limiting recovery of quality of life damages to a certain amount gives insurers some idea of their potential liability. *Id.* at 64 ("Minimizing these large awards may allow insurers to better match premiums to risk."). While we recognize that such a cap heavily punishes those most severely injured, it is not unconstitutionally arbitrary merely because it does so. Rather, it is targeted to control costs in one area where costs might be controllable.

Based upon this reasoning, the Supreme Court of Utah found that the $250,000 cap on noneconomic damages in medical malpractice cases established by the Utah Legislature is constitutional. *See also Estate of McCall v. United States,* 642 F.3d 944, 951 (11th Cir. 2011) ("The legislature identified a legitimate governmental purpose in passing the statutory cap, namely to reduce the cost of medical malpractice premiums and health care. The means that Florida chose, a per incident cap on noneconomic damages, bears a rational relationship to that end." (citation omitted.)); *Zdrojewski v. Murphy,* 254 Mich.App. 50, 657 N.W.2d 721, 739 (2002) ("The purpose of the damages limitation was to control increases in health care costs by reducing the liability of medical care providers, thereby reducing malpractice insurance premiums, a large component of health care costs. Controlling health care costs is a legitimate governmental purpose. By limiting at least one component of health care costs, the noneconomic damages limitation is rationally related to its intended purpose." (citation omitted)).

**18.** The cap at issue in *Evans* limited noneconomic damages in tort actions for personal injury or death to $400,000 or $8,000 multiplied by the injured person's life expectancy in years, whichever is greater, for each single injury or death. When the damages were awarded for " 'severe permanent physical impairment or severe disfigurement,' the cap extended to $1,000,000 or, in the alternative, $25,000 multiplied by the injured person's life expectancy in years, whichever is greater." 56 P.2d at 1049–50 (citation omitted).

■ Clearly, "it is the province of the legislature to determine socially and economically desirable policy and to determine whether a medical malpractice crisis exists." *Adams v. Children's Mercy Hospital*, 832 S.W.2d 898, 904 (Mo.banc 1992). "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211, 221 (1993). While we may not agree with the Legislature's decision to limit noneconomic damages in medical professional liability cases to $250,000 or $500,000, depending on the nature of the case, we cannot say the cap bears no reasonable relationship to the purpose of the statute. Accordingly, we find no merit to the MacDonalds' equal protection argument.

■ We also find no merit to the MacDonald's argument that the cap constitutes special legislation expressly prohibited by our state constitution.[19] In that regard, this Court has held

[t]o the extent that the "special legislation" prohibition found in Article VI, Section 39 of the West Virginia Constitution mirrors equal protection precepts, it is subsumed in the equal protection principles contained in Article III, Section 10 of our constitution. Consequently, arguments relating to this aspect of the special legislation prohibition will not be separately addressed where we have applied an equal protection analysis to the claim.

Syllabus Point 5, *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992).

■ **4. Certain remedy.** Finally, we address the MacDonalds' contention that the statutory cap violates the certain remedy provision of our state constitution. "Resolution of the 'certain remedy' question is fairly simple once the equal protection question is resolved." *O'Dell*, 188 W.Va. at 605, 425 S.E.2d at 560. This Court has held:

When legislation either substantially impairs vested rights or severely limits existing procedural remedies permitting court adjudication, thereby implicating the certain remedy provision of article III, section 17 of the *Constitution of West Virginia*, the legislation will be upheld under that provision if, first, a reasonably effective alternative remedy is provided by the legislation or, second, if no such alternative remedy is provided, the purpose of the alteration or repeal of the existing cause of action or remedy is to eliminate or curtail a clear social or economic problem, and the alteration or repeal of the existing cause of action or remedy is a reasonable method of achieving such purpose.

Syllabus Point 5, *Lewis v. Canaan Valley Resorts, Inc.*, 185 W.Va. 684, 408 S.E.2d 634 (1991). In *O'Dell*, this Court explained that

[i]nherent in our approach is the consideration of the reasonableness of the method chosen to alter or repeal existing rights. In our "certain remedy" analysis as opposed to our examination of equal protection principles, we consider the total impact of the legislation. Where its impact is limited rather than absolute, there is less interference with the "certain remedy" principle, and the legislation will be upheld.

188 W.Va. at 606, 425 S.E.2d at 561. Here, the impact of the statute at issue is limited to a narrow class—those with noneconomic damages exceeding $250,000. Furthermore, the Legislature has not imposed an absolute bar to recovery of noneconomic damages. Instead, the Legislature has merely placed a limitation on the amount of recovery in order to effectuate the purpose of the Act as set forth in W. Va.Code § 55-7B-1. Because the legislative reasons for the amendments to the Act are valid, there is no violation of the certain remedy provision and, thus, no merit to the MacDonalds' argument.

**5. Our holding.** Having found no merit to any of the constitutional challenges advanced by the MacDonalds, we now hold that W. Va.Code § 55-7B-8 (2003) (Repl.Vol. 2008), which provides a $250,000 limit or "cap" on the amount recoverable for a noneconomic loss in a medical professional liability action and extends the limitation to $500,000 in cases where the damages are for:

**19.** *See* note 9, *supra*.

(1) wrongful death; (2) permanent and substantial physical deformity, loss of use of a limb or loss of a bodily organ system; or (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life sustaining activities (both subject to statutorily-mandated inflationary increases), is constitutional. It does not violate the state constitutional right to a jury trial, separation of powers, equal protection, special legislation, or the "certain remedy" provisions, W. Va. Const. art. III, § 13; W. Va. Const. art. V, § 1; W. Va. Const. art. III, § 10; W. Va. Const. art. VI, § 39; and W. Va. Const. art. III, § 17, respectively.

We note that our decision today is consistent with the majority of jurisdictions that have considered the constitutionality of caps on noneconomic damages in medical malpractice actions or in any personal injury action. *See Davis v. Omitowoju,* 883 F.2d 1155, 1158–65 (3d Cir.1989) ($250,000 limit in medical malpractice actions by Virgin Islands statute; right to jury trial, substantive due process, and equal protection); *Estate of McCall v. United States,* 642 F.3d 944 (11th Cir.2011) ($1,000,000 in aggregate regardless of number of defendants for medical malpractice wrongful death by Florida statute; equal protection and takings clause); *Federal Express Corp. v. United States,* 228 F.Supp.2d 1267 (D.N.M.2002) ($600,000 on damages except punitives and medical care and related expenses by New Mexico statute; equal protection); *Evans ex. rel v. State,* 56 P.3d 1046 (Alaska 2002) ($400,000 [20] in personal injury or wrongful death actions; right to trial by jury, equal protection, substantive due process, separation of powers, right of access to courts, and special legislation); *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985) ($250,000 in medical malpractice actions; due process and equal protection); *Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.,* 95 P.3d 571 (Colo.2004) ($250,000 in medical malpractice actions; right to trial by jury, separation of powers, and equal protection); *Kirkland v. Blaine County*

*Medical Center,* 134 Idaho 464, 4 P.3d 1115 (2000) ($400,000 in personal injury cases; right to trial by jury, special legislation, and separation of powers); *Samsel v. Wheeler Transport Services, Inc.,* 246 Kan. 336, 789 P.2d 541 (1990) ($250,000 in any personal injury action; right to jury trial, certain remedy, and equal protection), *overruled on other grounds, Bair v. Peck,* 248 Kan. 824, 811 P.2d 1176 (1991); *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992) ($350,000 in personal injury actions; equal protection and right to trial by jury); *Zdrojewski v. Murphy,* 254 Mich.App. 50, 657 N.W.2d 721 (2003) ($280,000 in medical malpractice cases extended to $500,000 for certain severe injuries as specified in statute; right to trial by jury and equal protection); *Schweich v. Ziegler,* 463 N.W.2d 722 (Minn.1990) ($400,000 in all civil actions; certain remedy); *Adams v. Children's Mercy Hospital,* 832 S.W.2d 898 (Mo.banc 1992) ($350,000 per defendant in medical malpractice cases; equal protection, open courts and certain remedy, and right to trial by jury); *Gourley ex rel. Gourley v. Nebraska Methodist Health System, Inc.,* 265 Neb. 918, 663 N.W.2d 43 (2003) ($1,250,000 on all damages in medical malpractice actions; special legislation, equal protection, open courts and right to remedy, trial by jury, taking of property, and separation of powers); *Arbino v. Johnson,* 116 Ohio St.3d 468, 880 N.E.2d 420 (2007) (greater of $250,000 or three times the economic damages up to maximum of $350,000 in certain tort actions; right to trial by jury, open courts and certain remedy, due process, equal protection, and separation of powers); *Judd v. Drezga,* 103 P.3d 135 (Utah 2004) ($250,000 in medical malpractice cases; open courts, uniform operation of laws, due process, trial by jury, and separation of powers); *Pulliam v. Coastal Emergency Services of Richmond, Inc.,* 257 Va. 1, 509 S.E.2d 307 (1999) ($1,000,000 on all damages in medical malpractice cases; trial by jury, special legislation, taking of property, due process, equal protection, and separation of powers).

While there was a fairly even split among jurisdictions that had considered the constitutionality of caps on noneconomic damages

**20.** *See note 18, supra.*

at the time *Robinson* was decided, now only a few states have declared such caps unconstitutional. Moreover, most of those jurisdictions that have done so have based their decision on a constitutional provision providing that "the right to trial by jury shall remain inviolate." *See Moore v. Mobile Infirmary Assoc.*, 592 So.2d 156 (Ala.1991); *Atlanta Oculoplastic Surgery v. Nestlehutt*, 286 Ga. 731, 691 S.E.2d 218 (2010); *Lakin v. Senco Products, Inc.*, 329 Or. 62, 987 P.2d 463 (1999); *Knowles v. United States*, 544 N.W.2d 183 (S.D.1996), *superceded by statute as stated in Peterson ex rel. Peterson v. Burns*, 635 N.W.2d 556 (S.D.2001); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711 (1989). As discussed above, such analysis is not persuasive in this jurisdiction. Only in rare instances have courts found that such caps violate equal protection provisions. *See Brannigan v. Usitalo*, 134 N.H. 50, 587 A.2d 1232 (1991) (invalidating $875,000 cap in personal injury actions utilizing intermediate scrutiny analysis); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978) (invalidating $300,000 cap for all claims in medical malpractice actions utilizing intermediate scrutiny analysis); *Ferdon v. Wisconsin Patients Compensation Fund*, 284 Wis.2d 573, 701 N.W.2d 440 (2005) (invalidating $350,000 cap in medical malpractice actions utilizing rational basis test). Our decision today places West Virginia squarely with the majority of jurisdictions in holding that caps on noneconomic damages in medical malpractice cases are constitutional.

### B. Cross–Assignments of Error

As noted above, two cross-assignments of error have been made in this case. First, both Dr. Ahmed and City Hospital challenge the circuit court's application of the $500,000 cap. Secondly, City Hospital asserts that the circuit court erred in denying its motion for summary judgment, motion for judgment as a matter of law, and motion for a new trial. Each of these assignments of error will now be discussed.

██ **1. Application of W. Va.Code § 55–7B–8(b)–The $500,000 cap.** Both Dr. Ahmed and City Hospital cross-assign as error the circuit court's finding that the $500,000 cap on noneconomic damages was applicable in this case. As indicated above, when the Legislature amended W. Va.Code § 55–7B–8 in 2003, it created a two-tiered system for noneconomic loss. Accordingly, W. Va.Code § 55–7B–8(a) provides for a $250,000 cap on noneconomic loss in any medical professional liability action. The cap is extended to $500,000 by subsection (b) of W. Va.Code § 55–7B–8 if the damages for noneconomic loss suffered by the plaintiff are for: "(1) Wrongful death; (2) permanent and substantial physical deformity, loss of use of a limb or loss of a bodily organ system; or (3) permanent physical or mental functional injury that permanently prevents the injured person from being able to independently care for himself or herself and perform life sustaining activities." The appellees maintain that the evidence did not support the findings of the circuit court and therefore, Mr. MacDonald's noneconomic loss should have been capped at $250,000 pursuant to W. Va. Code § 55–7B–8(a).[21]

██ It is well established that "factual findings made by the trial [court] are given great deference by this Court and will not be overturned unless they are clearly erroneous." *CMC Enterprise, Inc. v. Ken Lowe Management Co.*, 206 W.Va. 414, 418, 525 S.E.2d 295, 299 (1999). In this case, the circuit court's May 14, 2009, order sets forth detailed and lengthy factual findings justifying its decision to apply the $500,000 cap. The circuit court, having heard all the evidence during the course of the two-week trial, determined that Mr. MacDonald suffered a permanent and substantial physical deformity satisfying the criteria of W. Va. Code § 55–7B–8(b). Specifically, the court

---

**21.** A review of the record in this case shows that interrogatories were not submitted to the jury on this issue. Although the MacDonalds initially requested that the circuit court include questions on the verdict form that would have required the jury to determine whether Mr. MacDonald suffered a permanent substantial deformity, loss of use of a limb or loss of bodily organ system as specified in the statute, they subsequently withdrew the request. Apparently, the parties then agreed to allow the circuit court to decide the issue during post-trial motions. While this Court has cautioned against the overuse of interrogatories, this is a factual determination that clearly should have been made by the jury.

concluded that the evidence demonstrated that Mr. MacDonald's injuries constituted a "permanent and substantial deformity" because "the rhabdomyolysis has essentially caused the complete deterioration of his leg muscles." The court also concluded that Mr. MacDonald had suffered permanent and substantial loss of use of his legs and the loss of a bodily organ system, namely his muscle system, thereby, further satisfying the criteria set forth in W. Va.Code § 55–7B–8(b) and warranting application of the $500,000 cap. While this Court might have reached a different conclusion based on the evidence and record before us, it is not the role of an appellate court to second-guess the finder of fact. Having carefully reviewed the entire record, we find no clear error. Accordingly, we affirm the circuit court's decision on this issue.

**2. Denial of City Hospital's motion for summary judgment, motion for judgment as matter of law, and motion for a new trial.** Finally, City Hospital contends that the MacDonalds failed to present sufficient evidence to establish a *prima facie* case of negligence. City Hospital's argument on this issue is two-fold. First, City Hospital asserts that the MacDonalds failed to show that it breached the standard of care. Second, assuming there was a breach of the standard of care, City Hospital maintains that the MacDonalds were unable to produce any evidence establishing that such breach proximately caused Mr. MacDonald's injuries. City Hospital presented these arguments below, first at the summary judgment stage and then during trial, moving for judgment as a matter of law after the MacDonalds presented their case in chief. City Hospital renewed its motion for judgment as a matter of law at the conclusion of the trial and also made a motion for a new trial. City Hospital now cross-assigns as error the circuit court's denial of these motions.

"It is axiomatic that in a medical malpractice lawsuit such as the instant case, a plaintiff must establish that the defendant [health care provider] deviated from some standard of care, and that the deviation was 'a proximate cause' of the plaintiff's injury." *Mays v. Chang,* 213 W.Va. 220, 224, 579 S.E.2d 561, 565 (2003).[22] In other words, "a plaintiff's burden of proof is to show that a defendant's breach of a particular duty of care was *a* proximate cause of the plaintiff's injury, not the *sole* proximate cause." *Id.* (emphasis in original). *See also* Syllabus Point 2, *Everly v. Columbia Gas of West Virginia, Inc.,* 171 W.Va. 534, 301 S.E.2d 165 (1982) ("A party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of the injury."). Also, " ' "[i]t is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses." Syl. Pt. 2, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964).' Syl. pt. 1, *Farley v. Meadows,* 185 W.Va. 48, 404 S.E.2d 537 (1991)." Syllabus Point 3, *Farley v. Shook,* 218 W.Va. 680, 629 S.E.2d 739 (2006). West Virginia Code § 55–7B–7(a) (2003) (Repl.Vol.2008) states: "The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."

In this case, the only allegation of a breach of the standard of care asserted by the appellants at trial against City Hospital concerned the failure of the hospital pharmacy to alert Dr. Ahmed of the risks associated with prescribing the medication Lipitor in combination with the other medications that Mr. MacDonald was taking during his hospitalization. City Hospital argues that the MacDonalds' evidence actually established

---

**22.** W. Va.Code § 55–7B–3 (1986) (Repl.Vol.2008) provides, in pertinent part:

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

that the risk-benefit analysis that is performed when prescribing multiple medications is the responsibility of the physician, not the hospital pharmacy. Therefore, City Hospital asserts that the evidence of a breach of the standard of care by the hospital pharmacy was "murky at best" because it is the physician who ultimately makes the decision regarding which medications will be administered to the patient.

City Hospital's argument is based upon testimony elicited on cross-examination of the MacDonalds' expert in the field of pharmacy, James M. Backes, Pharm.D. In response to questioning from counsel for City Hospital, Dr. Backes acknowledged that pharmacists cannot prescribe medication nor can they discontinue medication that has been prescribed to a patient. Dr. Backes further testified, however, that the standard of care requires the hospital pharmacy to inform the attending physician, in this case, Dr. Ahmed, of possible drug interactions and that the hospital pharmacy's failure to do so in this case constituted a breach of the standard of care.[23] A review of the record shows that in addition to Dr. Backes's testimony, the appellants also introduced into evidence City's Hospital's policy and procedures manual which requires the pharmacy to bring potential drug interactions to the attention of the attending physician. In addition, it is noted that City Hospital's own pharmacy expert, Rodney Richmond, and City Hospital's corporate designee, Christian Miller, each acknowledged that the hospital pharmacy had a duty to alert the physician of potential drug interactions.

■■■ This Court has explained that "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Syllabus Point 5, *Hatten v. Mason Realty*

Co., 148 W.Va. 380, 135 S.E.2d 236 (1964). In light of Dr. Backes's testimony and the other evidence discussed above, we believe that a reasonable jury could have concluded that the City Hospital pharmacy had a duty of care that required it to inform the attending physician of the potential drug interaction among the medications that had been prescribed for Mr. MacDonald and that the hospital pharmacy's failure to do so resulted in a breach of the standard of care.[24]

■■■ We, likewise, believe that the jury could have further concluded that the hospital pharmacy's failure to notify Dr. Ahmed of the potential drug interaction was a proximate cause of Mr. MacDonald's injuries. City Hospital maintains otherwise in this appeal because Dr. Ahmed testified at trial that he was aware of the risks associated with the drug therapy that he was prescribing for Mr. MacDonald including the risk of rahbdomyolysis and that even if he had received a warning from the hospital pharmacy, he would have proceeded with the same course of treatment as he assessed the risk of Mr. MacDonald developing rahbdomyolysis to be less than the risk of him developing other, more life-threatening complications if the drug regimen had been changed. Having carefully reviewed the record, we find no merit to City Hospital's argument. As noted above, the question of proximate cause is ordinarily for the jury to determine. Syllabus Point 5, *Hatten, supra.* Having listened to and observed Dr. Ahmed's testimony, a reasonable jury could have concluded that Dr. Ahmed did not in fact know of the possible drug interactions or, at least, did not appreciate the severity of the drug interactions and that he might have actually taken a different course of action had he been alerted of the possible drug interaction by the hospital pharmacy. If that were the case, then the jury could have found that City Hospital's negligence was a proximate cause of Mr. MacDonald's injuries. Such a conclusion is

---

**23.** There is no dispute in the record that the hospital pharmacy did not contact Dr. Ahmed regarding the possible drug interaction.

**24.** A review of the trial transcript shows that the focus of the expert testimony at trial was whether

or not the potential drug interaction among Lipitor and the other drugs prescribed to Mr. MacDonald, namely Cyclosporine and Diflucan, was known in 2004.

well within the province of the jury as " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions[.]' " *Williams v. Precision Coil,* 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986)).

In summary, we find that the circuit court did not err in denying City Hospital's motion for summary judgment, motion for judgment as a matter of law, and motion for a new trial. Not only did the MacDonalds present a genuine issue of fact for trial, but when the evidence is considered in the light most favorable to the MacDonalds, the non-moving party, there is sufficient evidence to sustain the circuit court's decision denying City Hospital's motions for judgment as a matter of law and a new trial.

## IV.

### CONCLUSION

For the reasons set forth above, the final order of the Circuit Court of Berkeley County entered on August 20, 2009, is affirmed.

Affirmed.

Chief Justice WORKMAN delivered the Opinion of the Court.

Justice KETCHUM and Justice McHUGH, deeming themselves disqualified, did not participate in the decision in this case.

Judge WILSON and Judge EVANS, sitting by temporary assignment.

Judge WILSON dissents and reserves the right to file a dissenting opinion.

WILSON, Judge, dissenting:

Why should a circuit court judge, honored to be sitting as a temporary justice in the MacDonald case, take the time (and have the effrontery) to dissent?

It is not because of the way I was treated by the Court. The entire Court was most deferential in considering my opinions.

It is not because I seek to carp, cavil, censure, or castigate our Supreme Court of Appeals.

In fact, I cannot allude to this Court without exultation. I have immeasurable respect for our Supreme Court and in particular for Justice Robin Davis, one of the brightest and most dedicated persons who have ever served on our highest state court.

It is not because I want to take issue with the high quality of medical care in West Virginia and the fact that doctors and other medical professionals needed some legislative help to control exorbitant malpractice insurance costs.

I dissent because, by this counterintuitive decision in this decisively important case, the justices capitulated to the West Virginia Legislature's political- and unconstitutional—mistreatment of medical malpractice victims, and by its decision, delivered the coup de grâce to the rights of thousands of West Virginians to be fully compensated for losses caused by the negligence of medical professionals.

The Supreme Court of Appeals was concerned that if it declared that the Legislature's lowering of the cap was unconstitutional, that would mean that the Court would be substituting its judgment for that of the Legislature. The Court was also reticent to rule in favor of the Plaintiffs because it didn't want to be perceived as sitting as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.

Not affecting fundamental rights? This is the West Virginia Constitution we were interpreting. By hand-wringing about judicial restraint and deferring to the Legislature when considering an issue as serious as the one in this case, the Supreme Court failed to preserve those human rights to which our legal system is committed.

The West Virginia Legislature made a purely political decision and violated the West Virginia Constitution when it drastically reduced the cap on noneconomic damages in medical malpractice cases from $1 million to $250,000, in most cases.

When the Legislature turns against its constituency in favor of pressure groups with selfish interests, it is the peoples' right to seek help from their Supreme Court, and it is the duty of the judicial branch to exercise its proper role in the "separation of powers" to void legislation that violates the constitutional rights of its citizens.

Malpractice victims' damages may be primarily noneconomic with permanent disfigurement, maiming, and even death caused by a medical professional's negligence. The capital facts of human suffering are hidden from our view. An unknown number of medical negligence victims can no longer use the court system because of the cap and the fact that lawyers are no longer willing to risk huge litigation expenses for a low net return for their clients and themselves. The cap deprives the injured of their right to full compensation for their injuries. But, in the most serious cases, it also deprives the injured person's loved ones-their caretakers-ALL of their damages. Thus, in *Robinson* each of the parents' respective $1,000,000 awards by the jury were taken away, and the $1,500,000 awarded to the child was reduced to $1,000,000, the cap at the time. And, in *MacDonald,* all of the compensation the jury awarded to Mrs. MacDonald was taken by the cap.

Not affecting fundamental rights? The right to a trial by a jury is the most fundamental of our constitutional rights. Query: If a person has a right to a jury trial and the jury award is completely taken away, did that person have a court open to him for an injury done to him? Did he have a remedy? Was justice administered without denial? Did he have his constitutional right to a jury trial?

How could the majority in MacDonald avoid the reverberating "NO" answer to these questions when the answer had been clearly stated in several West Virginia cases and most recently in *Willey v. Bracken,* —— W.Va. ——, —— S.E.2d —— (2010) a 2010 case:

"Pursuant to the Certain Remedy Clause, '[t]he courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputa-tion, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." W. Va. Const. Art. III, § 17. In other words, 'when a legislative enactment either substantially impairs vested rights or severely limits existing procedural remedies permitting court adjudication of cases, then the certain remedy provision of Article III, Section 17 of the West Virginia Constitution is implicated.' Syl. pt. 6, in part, *Gibson v. West Virginia Dep't of Highways,* 185 W.Va. 214, 406 S.E.2d 440 (1991). See also Syl. pt. 5, *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 408 S.E.2d 634 (1991) (setting out two-part analysis for determining if legislation implicates Certain Remedy Clause). Thus, the Certain Remedy Clause prevents application of a statute that improperly denies a citizen his or her right to seek redress in the courts of this State for injuries received in West Virginia. See, e.g., *Kyriazis v. University of West Virginia,* 192 W.Va. 60, 450 S.E.2d 649 (1994) (finding anticipatory release that served as absolute bar to injury claims by rugby player violated Certain Remedy Clause).

The majority in *MacDonald* dismissed the idea that the cap deprived Mrs. MacDonald of her constitutional right to a jury trial despite the fact that all of the damages awarded to her by the jury were taken away by the cap. The Court's justification was that our State Constitution does not state that "the right to trial by jury shall remain inviolate." That is not the law.

The Court's degrading of the right of a jury trial in a civil case in West Virginia is in square conflict with the United States Constitution. The phrases used in the United States Constitution and the West Virginia Constitution for granting the right to a civil jury trial are almost identical. For our Supreme Court to suggest that the right to a jury trial in West Virginia is not as great as that in another state that uses the phrase "the right to trial by jury shall remain inviolate" in its constitution makes no sense. If the Federal right to a jury trial is based upon the phrase "the right of trial by jury, if required by either party, shall be preserved"

and West Virginia's constitutional right to a jury trial is based upon the phrase "the right of trial by jury, if required by either party, shall be preserved" is our Supreme Court being a bit iniquitous to even suggest that the right to a jury trial in West Virginia is not as great as it is in, for instance, the state of Georgia?

I take solace in this position because it is consistent with the best legal mind in the State of West Virginia. Franklin D. Cleckley, in 1991, when he was the Arthur B. Hodges Professor of Law at West Virginia University College of Law wrote a law review article with Govind Hariharan, Ph.D., an Assistant Professor in the Department of Economics at West Virginia University, for the West Virginia Law Review[1] in which he expressed the opinion that the language in *Sargent v. Malcomb*, 150 W.Va. 393, 146 S.E.2d 561 (1966) suggests that the issue of noneconomic damages is a question for the jury:

> "There is no exact formula or standard for placing a money value on such matters as pain, suffering, and mental anguish resulting from personal injuries or embarrassment resulting from bodily disfigurement or scars. The law recognizes that the aggregate judgment of twelve duly selected and properly qualified jurors represents the best method yet devised for fixing the amount of just compensation to the injured plaintiffs in such cases."

*Sargent* at 566. Justice Cleckley then added this powerful statement:

> "The language in Sargent should be a compelling echo from the past, guiding the present Court when it construes section 55–7B–8. [The statute that places a limit or cap on compensatory damages for noneconomic loss awarded in a medical professional liability action.] This section is a clear indication of the rich and powerful protecting themselves at the expense of the economically disadvantaged and politically powerless. Section 55–7B–8 is a deadly cancer, eating away at the integrity and impartiality of our state legal system.

It must be surgically removed by the Court or through the voting capacity of the citizens of this state."

Cleckley 94 W.Va. L.Rev. at 46.

Not affecting fundamental rights? The right of equal treatment is also a very fundamental right. How can a damage cap that blatantly favors a special class of medical professional by limiting or taking away the damages an injured person may recover from a medical professional be constitutional? No other person who negligently injures another person is given that unconstitutional protection. Would any West Virginia legislator suggest that lawyers be given that special protection? I doubt it.

The resolution of the high insurance rate problem for medical professionals on the backs of completely innocent victims of medical professional negligence, a problem caused in part by a handful of incompetent medical professionals, is a resolution of one problem for a select group of people along suspect lines. The Legislature may have rationally believed that decreasing the cap on noneconomic damages would reduce medical malpractice premiums and solve the medical professions' problem, but that does not mean that it had a right to solve the problem by stripping victims of medical malpractice of their right to adequate compensation for medical negligence that caused injuries, maiming, and death.

This is what this case is really about:

It's about all of those West Virginians who don't understand what the West Virginia Legislature did to them. They don't understand what being deprived of meaningful "noneconomic" damages means to the seriously injured West Virginian. Those who would mislead the public, disparage noneconomic damages as not being serious damages. That is false.

"Noneconomic damages" are not limited to pain and suffering or loss of consortium. They include damages for the loss of the ability to have children, the loss of a limb, or disfigurement. In many medical negligence

---

1. Franklin D. Cleckley and Govind Hariharan, *A Free Market Analysis of the Effects of Medical Malpractice Damage Cap Statutes: Can We Afford to Live With Inefficient Doctors?*, 94 W. Va. L.Rev. 11 (1991).

cases "economic damages are minuscule." "Economic damages" are those damages that include lost wages, medical bills and other types of economic losses.

If a mother or a father is not earning wages because she or he chooses to stay home with little children, there is no lost wages claim when that person is the victim of medical negligence.

Those medical bills that mom or dad regularly paid a substantial sum to an insurance company to cover in the event they were needed, and when hospital and doctor bills are incurred because of medical malpractice, the medical expenses will, in most cases, be paid—are paid—by their health insurance company and can be recovered as economic damages. But that's not as promising as it sounds. The rest of the story is that mom and dad now have to reimburse their health insurance company for those medical payments! That's right-mom and dad not only have to pay the insurance premiums for the insurance in the event of a loss, they now have to pay the costs to bring the lawsuit to seek a jury award covering those expenses, pay the attorney for representing them, and then they have to reimburse the health insurance company for the medical bills that were covered by the insurance that mom and dad paid for. It's a wonderful business world for insurance companies.

This case is about what has already happened to the malpractice victims in the three West Virginia cases that challenged the constitutionality of the malpractice cap. These are real people who deserved more when they pursued justice in our West Virginia courts.

Let me introduce them. First it was Mark, just a child, with a normal life expectancy. But that's all that's normal. Mark has total brain damage caused by a medical professional's negligence. Even the child's ability to walk is severely limited. It's also about Mark's mom and dad and all of those superb parents whose lives are drastically changed by permanent injuries caused to their children by a medical professional's negligence. Spend a day in their shoes if you think mental pain and loss of enjoyment of life are frivolous damages. Each day they deal with what a negligent doctor did to their lives—they do their best to live a normal family life—but the quality of their lives is irreparably weakened.

Gone is the ability of the Robinsons to do the happy things they could do before their son was permanently injured. Fortunately the noneconomic damages cap at that time was $1 million. That covered some of the noneconomic damages the jury awarded Markbut his mom and dad had all their damages taken away by the cap. See, *Robinson v. Charleston Area Medical Center*, 186 W.Va. 720, 414 S.E.2d 877 (1991).

It's about the Verbas and the children who suffer from the death of a parent whose life was cut short because of a medical professional's negligence. The parent's economic loss was negligible. Therefore, after attorneys' fees, required expert witness fees, costs of litigation, and the medical "cap," the children receive little for their terrible loss. See, *Verba v. Ghaphery*, 210 W.Va. 30, 552 S.E.2d 406 (2001).

It's about the MacDonalds, a loving wife and her husband enjoying a good life together until a medical professional's negligence permanently changed that and caused the husband to suffer a severe form of muscle damage that kept him from walking until after an extended period of rehabilitation and physical therapy. Even after treatment he has a limited ability to walk and when he does he has to live with the burden of severe muscle weakness and balance issues with his lower body. If you think that the loss of consortium is an insignificant loss, step in this wife's shoes. Wake up one morning and suddenly it's gone! All of those things we take for granted each day from and with our loved one is gone—or is drastically changed. See, *MacDonald v. City Hospital, Inc.*, 227 W.Va. 707, 715 S.E.2d 405 (2011).

This is what this case is really about.

It's about constitutional choices. The Supreme Court had a choice to choose to declare this cap legislation unconstitutional. The Court had every right and a duty to do so.

It's about our Supreme Court of Appeals not accepting that it is the principal expositor of our State Constitution; that it is an equal branch of government and not a minion to the Legislature. Our Court now appears to be a court obsessed with the belief that its role is to be the branch of government that always exercises due restraint when there is an issue involving the principle of the separation of powers in government among the judicial, legislative and executive branches. It now appears that the Court has become so concerned with being labeled an "activist court" and accused of not having any concern for business interests that it is now failing to fulfill its constitutional mandate to protect the rights of all West Virginians.

An essential function of the Supreme Court of Appeals is to choose among alternative interpretations of our State Constitution. The Legislature did exactly that when it imposed the previous $1,000,000 cap on noneconomic damages as part of the West Virginia Medical Professional Liability Act of 1986, W. Va.Code §§ 55–7B–1 to –11. It made a choice to favor the medical profession over people who are injured by negligent professionals.

Thomas McHugh, a relatively young Justice in 1991, but already acknowledged as a nonpareil on a great Supreme Court that included Chief Justice Miller and Justice Neely, wrote the Court's opinion in *Robinson*. That opinion recognized that that "cap" legislation, which only protected the negligence of "health care providers" and no other negligent parties, was a close constitutional call. There is nothing in that opinion for anyone to conclude that it is not the role of the Supreme Court Justices to review legislation that infringed on constitutional rights.

The constitutional choice made by the Court in *Robinson* was that the Court could not say that the $1 million cap was not rationally related to a legitimate state interest; that the Court could not say that the Legislature's conclusion that it was in the public interest to attempt to obtain some cost savings by limiting noneconomic damages violated the Constitution. In reaching that decision the Court appeared to be greatly influenced by the fact that West Virginia's $1,000,000 cap was the largest "cap" on noneconomic damages of which the Court was aware.

However, Justice McHugh, writing for the Court, warned the Legislature in no uncertain words:

"We emphasize at this point that our holding that the statutory "cap" at issue is reasonable is limited to the particular $1,000,000 "cap" before us. "[A]ny modification the legislature [would] make[ ] is subject to being stricken as unconstitutional. A reduction of non[economic] damages to a lesser cap at some point would be manifestly so insufficient as to become a denial of justice[,]" under, for example, the state constitutional equal protection or "certain remedy" provisions. *Lucas v. United States*, 757 S.W.2d 687, 700 (Tex. 1988) (Gonzales, J., dissenting)."

The majority in *MacDonald* called this warning to the Legislature "dicta." Op. at 716, 715 S.E.2d at 414. No, it was not dicta—it was not a comment made in passing. It was a warning to the Legislature that the amount of the cap was very important to the Court's decision; that the amount of the cap was a critical fact in the decision reached in *Robinson*.

Its purpose was to send a message to the Legislature: Don't reduce that cap again!

The Legislature heard that message and did not attempt to go beyond its constitutional limits until 2003 when the political climate in West Virginia was changing and the State was becoming more conservative. A more conservative Legislature decided it had a right to ignore the Court's warning and it lowered the cap on noneconomic losses in medical malpractice cases from the $1 million cap adopted in 1986 to $250,000 per occurrence, or $500,000 if the negligence resulted in wrongful death; permanent and substantial physical deformity; loss of use of a limb or loss of a bodily organ system; or permanent physical or mental functional injury that permanently prevented the injured person from being able to independently care for himself or herself and from perform life sustaining activities.

The legislature knew about Justice McHugh warning in *Robinson* and that it was pushing the limits of its right to radically lower the cap. But the Legislature succumbed to tremendous pressure from the medical profession, the insurance lobby, and such groups as The American Tort Reform Association (ATRA), a special interest group founded in 1986 by the American Medical Association and American Council of Engineering Companies, and the U.S. Chamber of Commerce's' spin-off organization, the Institute for Legal Reform (ILR). The ILR issues an annual report on each state's "lawsuit climate," ranking states from 1 to 50 on their friendliness to business, based on a survey of general counsel of very large businesses and their outside counsel. West Virginia worked its way to the bottom of the ILR lawsuit climate list (starting at 49th but bottoming out in 2007).

It was at about the time of the 2003 change in the medical malpractice cap that we started to hear about West Virginia being a "judicial hellhole." By 2006 West Virginia was at the top of the hellhole list and by 2007 it was also at the bottom of the ILR list. It is now clear that this anti-business and judicial hellhole public relations attacks on West Virginia and West Virginia Courts have become an unwelcome influence on our Legislature.

Although it has no basis in truth, this public relations campaign by special interest groups is obviously working. In addition to the caps on medical malpractice damages the West Virginia legislature has enacted a number of significant pro-defendant changes in the law. Third-party bad faith claims against insurance companies have been eliminated. There are also limits on joint and several liability and restrictions on lawsuits by out-of-state residents. And still the hellhole label remains.

These same special interest groups are very active in judicial campaigns. Judges and Justices have to run for their positions in contested elections. Without question, our present Supreme Court is an independent judiciary that is not influenced by these special interest groups. But the message being sent in the *MacDonald* case to the Legislature and those special interest groups is that they now have a green light to proceed with legislation that favors corporations, insurance companies and special interest groups over the needs and interests of people.

Although we wish it were not so, all judges have audiences that they seek to please. With these audiences and with the natural desire to win expensive elections, it is essential for judges and justices to always remember the importance of the protections given to all people in our State and Federal Constitution and to decide disputes based on those cherished documents. In many cases that means a decision that displease a majority of the voters. It may mean that a judge's audience will be unhappy with the decision. But an independent judiciary has to protect the rights of minorities as well as the rights of the majority. And an independent judiciary has to protect the rights of victims of medical negligence as well as the rights of doctors who are overcharged by insurance companies. The Supreme Court of Appeals of West Virginia failed to do so in *MacDonald*.

Thus I respectfully dissent with the hope that our Court will cease to be a Court that is unduly restrained in the exercise of its power, recognizing the foundations of its power, and using that power responsibly for all who come before it.