450 S.E.2d 649

**Jeffrey KYRIAZIS, Plaintiff Below, Appellant**

v.

**UNIVERSITY OF WEST VIRGINIA; University of West Virginia Board of Trustees, A/K/A University System of West Virginia Board of Trustees; the Rugby Club of University of West Virginia; William Fitzpatrick, Defendants Below, Appellees.**

No. 22086.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Oct. 28, 1994.

Thomas A. Berret, Meyer, Unkovic & Scott, Pittsburgh, PA and Carl H. Cather, III, Spilman, Thomas & Battle, Morgantown, for appellant.

Timothy J. Padden and Bruce A. Kayuha, Rose, Padden & Petty, Morgantown, for appellees.

NEELY, Justice:

The appellant, Jeffrey Kyriazis, filed a complaint in the Circuit Court of Monongalia County against appellees seeking damages for injuries he suffered while playing rugby in a match held by the West Virginia University Rugby Club. The outcome of this appeal turns on the validity of an anticipatory release signed by the appellant and found to be an absolute bar to his claim by the trial court in its order that granted summary judgment in favor of the Board of Trustees ["Board"] and William Fitzpatrick, the faculty advisor to the Rugby Club. Because we find the anticipatory release in this case violates public policy and equal protection under the West Virginia *Constitution*, we find the circuit court improperly granted the summary judgment, and for the reasons stated below, we reverse and remand.

## FACTS

In February 1990, during the second semester of his sophomore year, the appellant became interested in playing rugby after seeing notices posted for the sport at the university. Mr. Kyriazis' interest resulted in his attending an organizational meeting of the Rugby Club, and, eventually, his decision to join the club.

In his deposition, Mr. Kyriazis testified the club held practice three days per week for six to eight weeks before the first match. Appellee Fitzpatrick, the coach and faculty advisor, provided the instruction and coaching at the practices that were conducted on the property of West Virginia University ["University"]. Scrimmages occurred during some of the practices, as well as on one separate day. The appellant participated in most of the practices and one separately held scrimmage.

During one of the practices, the team captain told the players they were all required to sign a document entitled "West Virginia Sports Club Federation, Rugby Club, Re-

lease, Waiver, and Participation Agreement" ["Release"].[1] Although the parties to this appeal disagree as to whether Mr. Kyriazis understood the terms of the Release, the appellant signed the form[2].

Before joining the Rugby Club, the appellant had no previous experience with the sport. On 7 April 1990, while playing in his first match, Mr. Kyriazis left the game in the second half after he became dizzy and lost his balance. Later medical studies revealed appellant had suffered a basilar-artery thrombosis.

In April 1992, Mr. Kyriazis filed his complaint against the appellees seeking damages in excess of $100,000 up to but not in excess of defendant's liability insurance coverage for his injury. As one of their defenses to the complaint, the Trustees and Dr. Fitzpatrick asserted the signed Release barred appellant's claim. Thereafter, the parties engaged in extensive discovery, all related to the validity of the Release.

According to Mr. David Taylor, the Director of Student Activities at the University, the University's Department of Student Activities offers students the opportunity to participate in athletics through intramural programs and club sports.[3] The difference between intramural programs and sports clubs lies mainly in the degree of control the University exercises over each. Although the Board undertakes no role with the creation, organization, regulation or supervision of club sports, including the Rugby Club, it does actively control intramural programs and reviews them for safety.[4]

If a student wants to participate in a sport not offered in the intramural program, he or she may form or join a sports club and the sports club may obtain recognition from the university.[5] This recognition entitles the sports club to money from the university, as well as the use of university facilities. After a sports club becomes an authorized student organization, it may also join the Sports Club Federation ["Federation"] and receive addi-

1. The complete text of the Release is in capitals and reads as follows:

    I am aware that rugby is a hazardous activity, and I am voluntarily participating in this activity with knowledge of the danger involved and hereby agree to accept any and all risks of property damage, personal injury, or death.

    In consideration of my participation, I hereby release West Virginia University, The University of West Virginia Board of Trustees, The Sports Club Federation, The Rugby Club, and any of its instructors or agents from any present and future claims, including negligence, for property damage, personal injury, or wrongful death, arising from my participation in rugby club activities.

    Furthermore, I hereby voluntarily waive any and all claims, both present and future, arising from my participation in rugby club activities, including but not limited to negligence, property damage, personal injury, and wrongful death.

    I understand that rugby involves certain risks, including but not limited to, travel to and from the site of the activity, severe physical contact, and the possible reckless conduct of other participants. These risks also include but not [sic] are not limited to death, serious neck and spinal injuries resulting in complete or partial paralysis, brain damage, and serious injury to virtually all bones, joints, muscles and internal organs. I further understand that rugby involves a particularly high risk of knee, head, and neck injury.

    I further understand that the rugby activities that I participate in may be conducted at sites that are remote from available medical assistance; and nonetheless agree to proceed with such activities in spite of the possible absence of medical assistance. I also understand that any equipment provided for my protection may be inadequate in preventing serious injury.

    I have read this form and fully understand that by signing this form, I am giving up legal rights and/or remedies which may be available to me.

    Witness: _____
    (Signature of Student)     Date
    Witness: _____
    (Signature of Parent or     Date
    Guardian if Student not
    at lease [sic] 18 years of age)

2. Although the issue of assumption of the risk was not raised or briefed before the circuit court, the parties have briefed the issue here. Because this doctrine does not affect our inquiry into the *validity* of the Release itself, we reserve our discussion of assumption of the risk for last.

3. The University began its intramural program in 1927. Sports clubs arrived in the late 1960s.

4. The University does require sports clubs to submit certain documents, including a yearly officer and advisor update.

5. The process for securing University recognition of a sports club is not at issue here.

64

tional money.[6] In 1974, the Rugby Club successfully petitioned for University recognition and maintained such status as of the date of appellant's injury. It was also a member of the Sports Club Federation at that time.

Mr. Taylor testified that the University did not require a signed Release as a condition of participation if the student were involved in intramural sports, in a sports club that was *not* a member of the Federation, or if the student were involved in an activity of any other student organization. Instead, the only students required to sign the Release were those whose sports clubs belonged to the Federation.[7] Although the Office of General Counsel approved the Release, the evidence in the record reveals the Release policy was made without any involvement by the Director of Student Activities, the University President, or the Board.

After the discovery of the above facts, the appellant moved for partial summary judgment seeking a determination that: (1) the anticipatory Release he signed was void as against the public policy of the State of West Virginia; (2) the policy requiring him to sign the Release was unconstitutional under the *Constitutions* of the State of West Virginia and the United States; and (3) the policy was invalid because it was not properly adopted by the appellees. The appellees filed cross-motions for summary judgment and the Board and Dr. Fitzpatrick based their motions on the claims that the anticipatory Release constituted an absolute bar to suit and that the University owed no duty to the appellant. On 14 July 1993, the circuit court granted appellees' motions. The court entered a supplemental order on 3 September 1993 confirming the dismissal.

In this appeal, the appellant asserts the following errors: (1) the circuit court erred in denying his motion for partial summary judgment and in granting the appellees' motions because the anticipatory Release is contrary to the public policy of the State of West Virginia; (2) the circuit court erred in deny-

ing Appellant's motion for partial summary judgment because the Release is an unconstitutional deprivation of his right to equal protection guaranteed by the West Virginia and the United States *Constitutions,* and unconstitutionally deprives him of his right to a certain remedy as guaranteed by the West Virginia Constitution; and (3) the circuit court erred in denying Appellant's motion for partial summary judgment because the Release was promulgated contrary to the procedures required for the adoption of official University policy and the persons who promulgated the policy lacked authority to do so. In determining the validity of the Release, we will consider each of these issues in turn.

*The Public Policy Issue*

In *Murphy v. North American River Runners, Inc.,* 186 W.Va. 310, at 314–315, 412 S.E.2d 504, 508–09 (1991), we outlined the West Virginia law on anticipatory releases as follows:

> Generally, in the absence of an applicable safety statute, a plaintiff who *expressly* and, under the circumstances, *clearly* agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct may not recover for such harm, unless the agreement is invalid as contrary to public policy. *Restatement (Second) of Torts* § 496B (1963, 1964) (express assumption of risk). When such an express agreement is freely and fairly made, between parties who are in an equal bargaining position, and there is no public interest with which the agreement interferes, it generally will be upheld....
>
> ...
>
> A clause in an agreement exempting a party from tort liability is, however, unenforceable on grounds of public policy if, for example, (1) the clause exempts a party charged with a duty of public service from tort liability to a party to whom that duty is owed, or (2) the injured party is similarly a member of a class which is protected

6. The University does not require a sports club to join the Sports Club Federation, and a sports club may receive official recognition and funding without joining the Federation.

7. The requirement of the Release for clubs in the Federation was also a recently implemented policy, having been adopted one or two years before appellant's injury.

against the class to which the party inflicting the harm belongs. *Restatement (Second) of Contracts* § 195(2)(b)–(c) (1979). (Emphasis in original) (Citations omitted).

*River Runners* considered whether a commercial whitewater rafting service could require its customers to sign an anticipatory release purporting to exempt it from tort liability for the failure of its guide to conform to the expected rafting standard of care. Before embarking on her river expedition, the plaintiff in *River Runners* had signed a pre-injury release in favor of the defendant. The plaintiff suffered serious injuries to her knees and ankles on her trip and later instituted a personal injury action against the whitewater service. The trial court found the executed release was a complete bar to plaintiff's claim and granted summary judgment in favor of the rafting company.

On appeal, we found the West Virginia Whitewater Responsibility Act imposed certain statutory duties upon commercial whitewater outfitters and guides that the legislature had enacted for the protection of participants in whitewater rafting expeditions. *River Runners* at 186 W.Va. 310, 317–318, 412 S.E.2d 504, 511–512. Because the anticipatory release exempted the whitewater defendant from these statutory safety standards, we held the pre-injury release invalid as a matter of public policy. 186 W.Va. at 318, 412 S.E.2d at 512.

In *River Runners, amicus curiae* contended the provision of services for a whitewater rafting expedition did not constitute a "public service." After stating the characteristics of a "public service" in an extensive footnote, we voiced our agreement with counsel on this point, but still stressed that "anticipatory releases for inherently hazardous recreational or amusement activities will usually be unenforceable when they involve a violation of statutory safety standards or intentional or reckless misconduct or gross negligence." 186 W.Va. at 315–16, 412 S.E.2d at 509–510. In the appeal before us now, we return to consider the issue of what constitutes a "public service," and whether the Board of Trustees qualifies as one that provides such services in this case.

*Tunkl v. Regents of University of California,* 60 Cal.2d 92, 383 P.2d 441, 32 Cal.Rptr. 33 (1963) (en banc), the leading case on the issue, lists six criteria to determine whether an anticipatory release violates public policy under the "public service" exception. Characteristics of a "public service" are that:

(1) it concerns a business of a type generally thought suitable for public regulation;

(2) the party seeking exculpation is engaged in performing a service of great importance to the public and which is often a matter of practical necessity for some members of the public;

(3) such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards;

(4) because of the essential nature of the service, and the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks such service;

(5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees to obtain protection against negligence;

(6) the person or property of members of the public seeking such services must be placed under the control of the furnisher of the services, subject to the risk of carelessness on the part of such furnisher or its servants.

*Tunkl,* 383 P.2d 441, 444–46, 32 Cal.Rptr. 33, 36–38.

The appellees argue the Board satisfies none of the above criteria for "public service" when it permits extra-curricular activities by sports clubs at West Virginia University. Appellees basically contend the Rugby Club is a recreational activity, and does not involve an essential service. They also assert the appellant freely entered into the agreement. We disagree with both arguments.

■ As the appellant notes in his response brief, the issue before this Court is not whether a recreational activity sponsored or offered by a commercial enterprise constitutes public service; the issue is whether a recreational activity sponsored by a *state university* constitutes public service. Although how one phrases the question often determines the answer one receives, the appellant correctly frames the issue here because the *Tunkl* criteria focus on the status of the entity providing the service. When considering whether an enterprise qualifies as a public service, we must examine the nature of the enterprise itself.

This Court has long held athletics are integral and important elements of the education mission at West Virginia University. In *Glover v. Sims*, 121 W.Va. 407, 411, 3 S.E.2d 612, 614 (1939), we stated:

> No one can successfully assert that a proper athletic program is not appropriate to a great educational institution. The physical welfare of young men and women cannot with propriety be ignored. Education is a proper function of state government and includes appropriate physical development as well as mental and moral. Granting that mistakes may have been made throughout the land in over-emphasis of inter-collegiate athletic activities, such fact can in no degree overshadow the wholesome importance of properly regulated and directed inter-collegiate and intra-mural athletic programs.

*See also, City of Morgantown v. West Virginia Board of Regents*, 177 W.Va. 520, 354 S.E.2d 616 (1987) (athletic programs are a proper and integral part of the education provided by state universities); *Kondos v. West Virginia Board of Regents*, 318 F.Supp. 394 (S.D.W.Va.1970), *aff'd* 441 F.2d 1172 (4th Cir.1971) (the carrying on of an athletic program is an important and necessary element in the educational process, especially in institutions of higher learning).

■ When a state university provides recreational activities to its students, it fulfills its educational mission, and performs a public service. As an enterprise charged with a duty of public service here, the University owes a duty of due care to its students when it encourages them to participate in any sport. The facts reveal the University even admitted athletic activities such as intramurals are an integral part of the education mission. Although the appellees cite abundant authority from other jurisdictions that hold athletic and recreational pursuits, *themselves,* are not matters of public service, they have not directed this Court to any similar authority involving state university sponsorship of these activities.

■ We now consider whether the Release in question is an agreement freely and fairly made between parties who are in an equal bargaining position. In *Helmick v. Potomac Edison Company*, 185 W.Va. 269, 276, 406 S.E.2d 700, 707 (1991), *cert. denied*, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991), this Court stated that when a gross disparity in bargaining power results solely from the monopolistic position of one of the parties, we will find the adhesion contract unenforceable. The appellees insist the appellant cannot place himself in the same category as a customer dealing with a monopolistic power company. We think he can.

The *Code of Student Rights and Responsibilities* of the University requires students to follow the instructions of representatives of the Administration. (R. p. 181, § 2.2). The University also admitted the Release was prepared by a lawyer in the Office of Counsel and nothing in the record reveals the appellant had benefit of counsel when he signed the Release. If appellant wished to play club rugby for the University, he had no choice but to sign the Release. These facts demonstrate the University's decisive advantage in bargaining strength over the appellant at the time he signed the Release.

■ Because we believe the University qualifies as a "public service," and that it possessed a decisive bargaining advantage over the appellant when he executed the Release, we find the anticipatory Release void as a matter of West Virginia public policy.

### The Equal Protection Issue

The appellant also asks us to find the Release violates equal protection principles

under the West Virginia and United States *Constitutions,* and violates the "certain remedies" provision of the *W.Va. Constitution,* Art. 3, Section 17. Appellant argues that the Board of Trustees cannot constitutionally require students participating in club sports to sign a release when it does not require students participating in intramural sports to do the same.

■ As an initial matter, we note the action taken by the appellees in this case constitutes sufficient state action to give appellant standing to raise his constitutional claims.[8] *See generally, G.M. McCrossin, Inc. v. W.Va. Board of Regents,* 177 W.Va. 539, 355 S.E.2d 32 (1987); *U.M.W.A. v. Parsons,* 172 W.Va. 386, 305 S.E.2d 343 (1983); *City of Morgantown v. Ducker,* 153 W.Va. 121, 168 S.E.2d 298 (1969). Furthermore, we recognize the scope and application of equal protection guaranteed by the West Virginia *Constitution* is coextensive or broader than that guaranteed by the Fourteenth Amendment to the United States *Constitution. See,* Syl. pt. 3, *Robertson v. Goldman,* 179 W.Va. 453, 369 S.E.2d 888 (1988).

■ To begin, equal protection means the State cannot treat similarly situated people differently unless circumstances justify the disparate treatment. *See, Courtney v. State Department of Health,* 182 W.Va. 465, 388 S.E.2d 491 (1989); *Israel v. Secondary Schools Activities Commission,* 182 W.Va. 454, 388 S.E.2d 480 (1989); *Janasiewicz v. Board of Education,* 171 W.Va. 423, 299 S.E.2d 34 (1982). As two commentators have noted, "[t]he equal protection guarantee has nothing to do with the determination of whether a specific individual is properly placed within a classification. Equal protection tests whether the classification is properly drawn." John C. Nowak and Ronald D. Rotunda, *Constitutional Law* § 14.2, at 570 (4th ed. 1991).

In *Cimino v. Board of Education,* 158 W.Va. 267, 274–275, 210 S.E.2d 485, 490

(1974), this Court stated the tests used to determine whether a classification will pass constitutional muster under equal protection:

Whether a statute or governmental action violates the Equal Protection Clause is a determination made by the application of one of two constitutional tests. The more demanding test relates to statutes which impinge upon sensitive and fundamental rights and constitutional freedoms, such as religion and speech. In order to uphold such a statute, a reviewing court must find that a compelling state interest is served by the classification....

In all other instances, the constitutionality of a statute, challenged under the Equal Protection Clause, is subject to the traditional standard requiring that the state law be shown to bear some rational relationship to legitimate state purposes.... Under this test, the court must consider whether the classification is a rational one based on social, economic, historic or geographic factors; whether the classification bears a reasonable relationship to a proper governmental purpose; and whether all persons within the classes established are treated equally.

■ We express no doubt about the classification created here. All students enrolled at West Virginia University have an equal right to participate in student activities. Our decision in *Pittsburgh Elevator Company v. West Virginia Board of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983), also allows any student injured through the negligence of the University or its agents to maintain a personal injury action. By conditioning students' participation in clubs of the Federation upon their executions of the anticipatory Release, without demanding the same from students involved in intramurals, non-Federation clubs or other activities, the University treats similarly situated persons differently. If a student participates in intramurals, non-Federation club sports or any other activity, he need not relinquish his legal rights in order to

---

**8.** The appellees do not dispute that state action exists here. They admitted that the Rugby Club was a recognized club which received financial support from the University, that Mr. Kyriazis was a student of the University and member of the Rugby Club at the time of his injury, that the University provided facilities for meetings and practices of the club, that appellee Fitzpatrick was the faculty advisor for the club and, finally, that the source of funding for all student activities comes from an activity fee. charged to each student.

participate. This is not true for the student who chooses to participate in a Federation club sport, such as the Rugby Club.

In support of the Release policy, the appellees argue various circumstances justify the disparate treatment. They claim that: (1) because the University limits its sponsorship of club sports it need not provide complete safeguards for the students in the club; (2) the policy protects the Board and others from potential liability; and (3) the Release apprises students of the physical dangers of the sport, as well as of the University's limited sponsorship. After considering all of these circumstances, this Court holds none of them withstands even rational basis scrutiny.[9] Although the University clearly places numerous responsibilities[10] upon the students involved in club sports, it still exercises such control over the club sports sufficient to constitute state action, as we found earlier. So the question of its involvement no longer becomes one of degree, but rather turns on reasonableness when we consider equal protection itself. To say the University may treat club sports differently from intramural sports because it funds and supervises them differently is to advance a tautology that does not consider equal protection. As appellant notes, this is not a defense.

By requiring a signed release for Federation club sports, the appellees also seek to relieve the Board and any instructors from liability. However, our decision *Pittsburgh Elevator Company v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), states that because the Board and other state officers are immune from suit when the state has procured liability insurance, no recovery is being sought from state funds and the cause of action is, in essence, a suit against a state agency's insurance carrier. 172 W.Va. at 756, 310 S.E.2d at 688–89. Although the appellees stress the availability of insurance does not prevent the possibility

of litigation, this Court sees no legitimate purpose in the requirement of the Release because *Pittsburgh Elevator* limits recovery against the Trustees and any of the instructors to the extent of the insurance retained. 172 W.Va. at 756, 310 S.E.2d at 688–89.

Because the appellees claim rugby is dangerous, they contend the Release is necessary as a warning to students who may choose to participate in the Rugby Club. But as appellant notes in his reply, injuries will occur in intramural sports, non-Federation club sports and other athletic activities that do not require their participants to sign anticipatory releases. The intramural program includes sports such as football, basketball and riflery. Club sports include crew and frisbee. And soccer is both an intramural and a club sport at the University.

When the prospect for injury in intramurals is equal to or greater than that in club sports, this Court sees no justification for requiring appellant to sign the Release as a condition of his participation. We hold the anticipatory Release violates the equal protection guarantee under the West Virginia *Constitution*. For similar reasons found for the equal protection violation, this Court also holds the anticipatory Release impermissibly interferes with appellant's right to a "certain remedy." *See*, Article III, Section 17 of the West Virginia *Constitution* ("... every person, for an injury done to him, in his person, property, or reputation, shall have remedy by due course of law...."); *Gibson v. West Virginia Department of Highways*, 185 W.Va. 214, 225, 406 S.E.2d 440, 451 (1991) (state policy violates "certain remedies" provision if it "severely limits existing procedural rights").

### The Adoption of the Policy

The appellant asks us to find the Release, as adopted, invalid under the provisions of

---

9. Because education is a fundamental right, and athletics are an integral part of education, the appellant suggests the classification is subject to strict scrutiny. *See, Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979). Having found the classification unconstitutional under rational basis review, however, we need not address the application of higher tier scrutiny here.

10. The University supervises and schedules the intramural events. In contrast, students in club sports must supervise and schedule the club's activities. This entails planning competitions, travel, arranging practices and matches, advertising club activities and generating additional money through fundraisers.

*W.Va.Code* 18B–1–1 [1989] *et seq.*, which establishes the Board of Trustees and delegates to it the responsibility of directing all of the affairs of the University, including education. Because we find other law dispositive on the question of the Release's validity, we need not address whether the Board properly adopted the Release.

■ As a final matter, we note a genuine issue of material fact exists here about whether appellant fully appreciated the attendant risks of club rugby [11]; even though the appellees argue Mr. Kyriazis understood the risks, we believe this is a factual matter to be properly determined by the jury on remand. *See*, Syl. pt. 5, *Desco Corporation v. Harry W. Trushel Construction Co.*, 186 W.Va. 430, 413 S.E.2d 85 (1991) ("The doctrine of assumed or incurred risk is based upon the existence of a factual situation in which the act of the defendant alone creates the danger and causes the injury and the plaintiff voluntarily exposes himself to the danger with full knowledge and appreciation of its existence").

Having found that the anticipatory Release in this case violates public policy, equal protection, and "certain remedy" principles under the West Virginia *Constitution* the judgment of the Circuit Court of Monongalia County is reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

11. In his deposition, Mr. Kyriazis testified he signed the Release before even participating in a scrimmage or observed match and claimed the risks of injury were not explained to him. Appellee Fitzpatrick testified he, personally, did not believe that injuries were inherent in rugby.