# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2013 Term**

_____

No. 11-1605

_____

**FILED**

**April 26, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**BRANDY PINGLEY, et al.,**

**Plaintiffs Below, Petitioners**

**v.**

**PERFECTION PLUS TURBO-DRY, LLC,**

**Defendant Below, Respondent**

_____

**Appeal from the Circuit Court of Randolph County**
**Honorable Jaymie Goodwin Wilfong, Judge**
**Civil Action No. 08-C-135**

**AFFIRMED**
_____

**Submitted: April 10, 2013**
**Filed: April 26, 2013**

Erika Klie Kolenich, Esq.              Rebecca A. Judy, Esq.
Klie Law Offices, P.L.L.C.             Stephen G. Jory, Esq.
Buckhannon, WV                         McNeer, Highland, McMunn
Counsel for Petitioners                and Varner, L.C.
                                       Elkins, WV
                                       Counsel for Respondent

**The Opinion of the Court was delivered PER CURIAM.**

SYLLABUS BY THE COURT

1.  "A circuit court's entry of summary judgment is reviewed *de novo*."  Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).


2.  "'"'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."  Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).'  Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W. Va. 706, 421 S.E.2d 247 (1992)."  Syl. Pt. 2, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994).


3.  "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."  Syl. Pt. 2, *Williams v. Precision Coil, Inc*., 194 W. Va. 52, 459 S.E.2d 329 (1995).


4.  "Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court."  Syl. Pt. 7, *Brown v. Genesis Health Care Corp*., 229 W. Va. 382, 729 S.E.2d 217 (2012).

i

5. "The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case." Syl. Pt. 4, *Brown v. Genesis Health Care Corp.*, 229 W. Va. 382, 729 S.E.2d 217 (2012).

6. "An analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." Syl. Pt. 3, *Troy Mining Corp. v. Itmann Coal Co.*, 176 W. Va. 599, 346 S.E.2d 749 (1986).

7. "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.' Syllabus Point 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West Virginia, Inc*., 186 W. Va. 613, 413 S.E.2d 670 (1991)." Syl. Pt. 6, *Brown v. Genesis Health Care Corp* , 229 W. Va. 382, 729 S.E.2d 217 (2012).

8.	"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract.	Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction.  These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract." Syl. Pt. 17, *Brown v. Genesis Health Care Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011).

9.	"Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party.  The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement.  Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns."  Syl. Pt. 19, *Brown v. Genesis Health Care Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011).

Per Curiam:

The petitioners, Brandy Pingley, *et al.* (hereinafter "the petitioners" or "the Pingleys"), appeal from an order of the Circuit Court of Randolph County granting summary judgment in favor of the respondent, Perfection Plus Turbo-Dry, LLC (hereinafter "the respondent" or "Perfection Plus"), in a case where the petitioners asserted claims for personal injury and property damage arising from the respondent's alleged negligence in failing to detect and/or remediate mold in their home, following a sewer backup that flooded the home with water and waste. By order entered on September 15, 2011, the circuit court held that the contract between the parties, which included a "Mold/Mildew/Bacteria Waiver," was neither unconscionable nor against public policy and was a complete bar to the Pingleys' claims. The court further held that the petitioners' claims were barred by the statute of limitations.

Based upon a careful review of the parties' briefs and arguments, the materials contained in the appendix record, and our relevant precedents, we affirm the judgment of the circuit court.

## I.  FACTUAL AND PROCEDURAL HISTORY

The facts which underlie this dispute were set forth in an earlier opinion in this case, *Pingley v. Huttonsville Public Service District* ("*Pingley I*"), 225 W. Va. 205, 691 S.E.2d 531 (2010):

The record indicates that in January or February of 2007, the Pingleys moved into their home in the East Daily area of Randolph County, West Virginia. The Pingleys allege that at approximately 2:00 a.m. on April 14, 2007, they awoke and found that their home was flooded with a substantial amount of sewage. The Pingleys contacted [Huttonsville Public Service District] to complain that the sewage backup in their home was caused by problems with HPSD's sewer system. As a result of the damage done to their home by the sewage backup, the Pingleys were forced to move out of their home for three and a half months.

HPSD, through its insurer, allegedly spent over $60,000.00 repairing the Pingleys' home and sewer line, and providing for the Pingleys during the repair period. The Pingleys believed that they were not adequately compensated for the damage caused by the sewage backup. Consequently, on June 9, 2008, the Pingleys filed the instant action against HPSD.

*Id.* at 206-07, 691 S.E.2d at 532-33 (internal footnotes omitted).

On December 11, 2008, the circuit court granted summary judgment in favor of the HPSD, which was reversed by this Court on the ground that the circuit court erred in ruling, as a matter of law, that an operator of a sewer system must have prior knowledge of a sewer problem before a duty arises to its customers. *Id.* at 209, 691 S.E.2d at 535.[1] Holding that the Pingleys had a right to conduct discovery in support of their claims that HPSD failed to

---

[1]The circuit court based its decision on a misapplication of our decision in *Calabrese v. City of Charleston*, 204 S.E.2d 650, 515 S.E.2d 814 (1999). With respect to the circuit court's conclusion that an operator of a sewer system must have prior knowledge of a sewer problem before a duty arises to its customers, we noted that "there is simply no language in [*Calabrese*] either expressly or implicitly addressing this issue." *Pingley I*, 225 W. Va. at 209, 691 S.E.2d at 535.

properly maintain, inspect, and repair its sewer system, this Court reversed and remanded the case for further proceedings. *Id*. at 210, 691 S.E.2d at 536-37.

During the course of the proceedings on remand, the Pingleys alleged for the first time that the flood of sewage into their home was attributable not only to the HPSD but also to Perfection Plus, an entity which had been hired on April 16, 2007, to "perform Emergency and/or Restoration Services and any/all necessary Supplemental Services . . . for damages to structure and/or contents sustained as a direct result of sewage backup occurring on 4/15/07." The company completed its work on June 11, 2007.[2]

Consequently, on July 28, 2010, the Pingleys filed their Third Amended Complaint, bringing Perfection Plus into the case as a defendant. The Pingleys claimed that immediately after Perfection Plus completed its work, they smelled a "stench" and observed a run-off of water under the house, which they contend was the result of a trench dug by Perfection Plus. They further claimed that as a result of Perfection Plus' negligence, their house was contaminated with mold and the mold was causing petitioner Brandy Pingley severe health problems.[3]

---

[2]The record indicates that continuing rainstorms complicated the clean-up process.

[3]These allegations concerning mold arose during the course of discovery. They were not mentioned in the Third Amended Complaint, in which the only specific allegation relating to damages caused by Perfection Plus' negligence was "a significant infestation of

(continued...)

3

It is undisputed that prior to July 28, 2010, the date on which the Third Amended Complaint was filed, Perfection Plus had no knowledge of the ongoing proceedings against HPSD, and no knowledge that the petitioners were dissatisfied with Perfection Plus' services.

On September 15, 2011, the circuit court entered an order granting summary judgment to Perfection Plus on the grounds that the contract between the parties, which included a "Mold/Mildew/Bacteria Waiver," was neither unconscionable nor against public policy, and that the petitioners' claims were barred by the statute of limitations. From this order, the Pingleys now appeal.[4]

## II. STANDARD OF REVIEW

"A circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). With regard to the circuit court's review of a motion for summary judgment, we have held:

> """A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W. Va.

---

[3](...continued)
silverfish."

[4]The Pingleys' claims against the HPSD have been settled and are not at issue in this appeal.

4

160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W. Va. 706, 421 S.E.2d 247 (1992)."

Syl. Pt. 2, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). Further:

> "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."

Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

## III. DISCUSSION

The contract between the Pingleys and Perfection Plus was a one page document in which Perfection Plus agreed to "perform Emergency and/or Restoration Services and any/all necessary Supplemental Services at [the Pingleys' home], for damages to structure and/or contents sustained as a direct result of sewage backup occurring on 4/15/07." The contract contained the following provision:

> **MOLD/MILDEW/BACTERIA WAIVER**
>
> An accumulation of moisture in a structure may give rise to the presence of mold, mildew and bacteria. Mold, mildew and bacteria may pose significant health risks to certain individuals. While Perfection Plus Turbo-Dry, LLC will make every effort to identify existing mold, mildew and bacteria and dry the structure, it offers <u>no assurance that your structure is free of mold, mildew or bacteria and may not be held liable for hazards to health or structure damages caused by mold, mildew or bacteria</u>. If the structure has ever sustained water damage and you are concerned about the presence of fungal growth, please contact a Certified Hygienist. Perfection Plus Turbo-Dry, LLC

5

and it's [sic] employees may discuss the dangers of mold grown, but they are merely opinions and should be substantiated by a Certified Hygienist. Perfection Plus Turbo-Dry, LLC['s] opinions should not dissuade you from seeking the professional advice of a Certified Hygienist prior to making a decision to forego Mold/Mildew and Bacterial treatments or remediation efforts. We encourage you to seek professional advice and/or testing on the subject.[5]

## A.  Unconscionability

The Pingleys admit that Perfection Plus' disclaimer of liability for damages caused by mold was discussed with them at the time they signed the contract. They allege, however, that the contract was one of adhesion because its terms were not negotiable, and that the waiver of liability is unenforceable for that reason. The petitioners characterize the document as a "take it or leave it contract," in a situation where Perfection Plus was the only business in the county that performed cleaning and restoration services and the petitioners were desperate to have their house cleaned up after it had been flooded with sewage.

The petitioners' argument, made in reliance on certain language excerpted from this Court's decision in *State ex rel. Clites v. Clawges*, 224 W. Va. 299, 685 S.E.2d 693 (2009),[6]

---

[5]The contract also contained an arbitration agreement which is not at issue in this case.

[6]The excerpted language from *Clites* is as follows:

The entire Agreement is boiler-plate language that was not subject to negotiation and there is no contention in the record

(continued...)

6

fails to take into account the dispositive issue in that case: whether the contract was unconscionable, notwithstanding the fact that it was a contract of adhesion. We prefaced our analysis in *Clites* by stating that, with respect to contracts of adhesion,

> '[a]dhesion contracts' include all 'form contracts' submitted by one party on the basis of this or nothing[.] Since the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable. Instead courts engage in a process of judicial review[.] Finding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not.

*Id.* at 306, 685 S.E.2d at 700 (quoting *State ex rel. Dunlap v. Berger*, 211 W. Va. 549, 557, 567 S.E.2d 265, 273 (2002)); *see also State v Sanders*, 228 W. Va. 125, 137, 717 S.E.2d 909, 921 (2011). We then "turn[ed] to the issue of whether the Agreement is 'unconscionable or was thrust upon [the Petitioner] because [she] was unwary and taken advantage of[.]'" *Clites*, 224 W. Va. at 306, 685 S.E.2d at 700 (quoting Syl. Pt. 3, in part, *Bd. of Ed. of the County of Berkley v. W. Harley Miller, Inc.*, 160 W. Va. 473, 236 S.E.2d 439 (1977)). We concluded

---

[6](...continued)
> that the Petitioner had any role or part in negotiating the terms of the Agreement. In *State ex rel. Saylor v. Wilkes*, 216 W. Va. 766, 773, 613 S.E.2d 914, 921 (2005), we found a similar arbitration agreement to be a contract of adhesion, noting that it was a '[s]tandardized contract form offered . . . on essentially [a] "take it or leave it" basis . . . [leaving the] weaker party . . . no realistic choice as to its terms.'

*Clites*, 224 W. Va. at 306, 685 S.E.2d at 700.

7

that under the facts and circumstances of the case, it was not. *Id*. at 306-07 & n.3, 685 S.E.2d at 701 & n.3.

"Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court." Syl. Pt. 7, *Brown v. Genesis Health Care Corp*. (*"Brown II"*), 229 W. Va. 382, 729 S.E.2d 217 (2012); *accord*, Syl. Pt. 1, *Troy Mining Corp. v. Itmann Coal Co.,* 176 W. Va. 599, 346 S.E.2d 749 (1986). With respect to such determination,

> [t]he doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.

Syl. Pt. 4, *Brown II*, 229 W. Va. at __, 729 S.E.2d at 220; *accord*, Syl. Pt. 12, *Brown v. Genesis Health Care Corp*. (*"Brown I"*), 228 W. Va. 646, 724 S.E.2d 250 (2011); Syl. Pt. 7, *Dan Ryan Builders, Inc. v. Nelson*, __ W. Va. __, 737 S.E.2d 550 (2012).

We have further held that "[a]n analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." Syl. Pt. 3, *Troy Mining Corp.*,176 W. Va. at 601, 346 S.E.2d at 750 (1986); *accord*, Syl. Pt. 5, *Brown II*, 229 W. Va. 382, 729 S.E.2d 217 (2012). More specifically, "[a] determination of unconscionability must focus

8

on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.'" Syl. Pt. 6, *Brown II,* 229 W. Va. at __, 729 S.E.2d at 221 (citing Syl. Pt. 4, in part, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co. of W.Va., Inc.*, 186 W. Va. 613, 413 S.E.2d 670 (1991)).

A determination of unconscionability requires a two-part analysis: whether the contract is procedurally unconscionable, and whether it is substantively unconscionable. *Brown I*, 228 W. Va. at 681, 724 S.E.2d at 285. "To be unenforceable, a contract term must – 'at least in some small measure' – be both procedurally and substantively unconscionable." *Dan Ryan Builders*, __ W. Va. at __, 737 S.E.2d at 558 (citing Syl. Pt. 20, *Brown I*, 228 W. Va. at 658, 724 S.E.2d at 262; *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W. Va. 486, 498-99, 729 S.E.2d 808, 820-21 (2012)).

With this analytical framework in mind, we turn to the facts of the instant case and review the circuit court's conclusion that the contract was neither procedurally nor substantively unconscionable.

This Court set forth the guidelines for determining procedural unconscionability in syllabus point seventeen of *Brown I*, 228 W. Va. at 657, 724 S.E.2d at 261:

Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

In the instant case, there was no great disparity in the relative positions of the parties: the Pingleys needed clean-up services, and although they claim that Perfection Plus was the only business of its type in Randolph County, the evidence of record does not reflect that Perfection Plus held "either a monopolistic or oligopolistic position in [this] particular line of commerce." *W. Harley Miller, Inc.*, 160 W. Va. at 486, 236 S.E.2d at 447. The contract was not a lengthy or complex document; it was one page long. The disclaimer was highlighted, both with a bold-face heading and with underlining of the key points, and it is undisputed that it was discussed with the Pingleys at the time the contract was signed. Although the Pingleys are not sophisticated businesspeople, nothing in the record indicates that they are illiterate or particularly unsophisticated with respect to normal business decisions affecting the household. Finally, although the contract may be viewed as a contract of adhesion – it was a pre-printed form contract and its terms were not negotiable – that "is the beginning point for analysis, not the end of it[.]" *Dunlap*, 211 W. Va. at 557, 567 S.E.2d

10

at 273 (quoting *Am. Food Mgmt, Inc. v. Henson*, 434 N.E.2d 59, 62-63 (Ill. App. 1982)); *see also Johnson Controls*, 229 W. Va. at __, 729 S.E.2d at 821 ("while adhesion contracts are worthy of additional scrutiny, they are 'generally enforceable because it would be impractical to void every agreement merely because of its adhesive nature.'" (citations omitted)). Taking all of these facts into account, we conclude that although the contract between the Pingleys and Perfection Plus was a contract of adhesion, it was not procedurally unconscionable under our precedents.

We turn now to the second part of the analysis. This Court set forth the guidelines for determining substantive unconscionability in syllabus point nineteen of *Brown I,* 228 W. Va. at 658, 724 S.E.2d at 262:

> Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns.

In the instant case, Perfection Plus contracted to provide general cleaning and restoration services, not to provide specialized services with respect to mold. To the contrary, the contract specifically informed the Pingleys that Perfection Plus offered no assurance that their water- and sewage-damaged home was free from mold, mildew or

11

bacteria, and specifically "encourage[d the Pingleys] to seek professional advice and/or testing on the subject." This is commercially reasonable; the law does not, and should not, require a commercial enterprise to assume liability for work that it is not equipped to perform. Our conclusion in this regard is buttressed by a report prepared for the Pingleys' attorney on March 14, 2011, by InspectRite Services, Inc., wherein InspectRite's employee found that there was mold in the Pingleys' home and cautioned that "[r]emediation services should be rendered *only by a professional, experienced, mold remediator*[.]" (Emphasis supplied.) A professional, experienced, mold remediator is exactly what Perfection Plus is not, as it so informed its customer at the time it arrived to provide basic cleanup and restoration services to the home.

Here, where Perfection Plus specifically advised the homeowners that it was not making any guarantee with respect to the presence or growth of mold, specifically advised the homeowners of steps to be taken if they had any concerns about mold, and specifically advised the homeowners to take those steps, nothing gives rise to an inference that the Pingleys were "unwary and taken advantage of[.]" Syl. Pt. 3, in part, *W. Harley Miller*, 160 W. Va. at 473-74, 236 S.E.2d at 440-41. The bottom line is that Perfection Plus' mold disclaimer was neither unfair nor unreasonable. *See Brown II*, 229 W. Va. at __, 729 S.E.2d at 228-29. We therefore conclude it was not substantively unconscionable under our precedents.

12

## B. Violation of Public Policy

Finally, we address the petitioners' contention that allowing Perfection Plus to disclaim liability for mold damage violates public policy. Specifically, the Pingleys argue that allowing a commercial entity to draft an anticipatory release would be akin to allowing an attorney to draft a contract of representation that disclaims liability for his or her malpractice. This analogy does not hold. Because "the relationship of attorney-at-law and client is of the highest fiduciary nature[,]" Syl. Pt. 3, in part, *Committee on Legal Ethics v. Cometti*, 189 W. Va. 262, 430 S.E.2d 320 (1993), attorneys providing legal services are subject to the West Virginia Rules of Professional Responsibility and the oversight of this Court. By statute,[7] by rule,[8] and by this Court's precedents, it has long been established that "[o]rdinarily, an attorney may not seek exoneration from potential malpractice claims in the absence of some statutory provisions." *Cometti*, 189 W. Va. at 270, 430 S.E.2d at 328 (citations omitted).

In the instant case, Perfection Plus did not have a fiduciary relationship with the Pingleys; rather, the parties entered into a standard, arms-length commercial transaction.

---

[7]"Every attorney-at-law shall be liable to his client for any damages sustained by the client by the neglect of his duty as such attorney." W. Va. Code § 30-2-11 (2012).

[8]"A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith." W. Va. R. Prof'l Conduct 1.8(h).

13

Therefore, in order to determine whether the contract at issue violated public policy, we examine our precedents involving anticipatory releases in non-fiduciary commercial settings.[9]

In *Murphy v. North American River Runners*, 186 W. Va. 310, 412 S.E.2d 504 (1991), the plaintiff/appellant had sustained injuries during a whitewater rafting expedition conducted by the defendant. The circuit court granted summary judgment to the defendant, finding that an anticipatory release executed by the plaintiff was a bar to the action.

In reviewing the validity of the release, this Court first noted that "[g]enerally, in the absence of an applicable safety statute, a plaintiff who *expressly* and, under the circumstances, *clearly* agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct may not recover for such harm, unless the agreement is invalid as contrary to public policy." *Id.* at 314-15, 412 S.E.2d at 508-09 (citing *Restatement (Second) of Torts* § 496B (1963, 1964)). We went on, however, to find that because the Legislature had in fact enacted a specific statutory standard of care for commercial whitewater outfitters, W. Va. Code § 20-3B-3(b) (1987), "a clause in an agreement purporting to exempt a party

_____

[9]We note that neither of the parties addressed this line of cases in their respective briefs. Further, during oral argument, neither appeared to be aware of this Court's relevant precedents, despite the fact that whether this commercial contract violated public policy was an issue in the case.

from tort liability to a member of the protected class for failure to conform to that statutory standard is unenforceable." *Id*. at 318, 412 S.E.2d at 512.

Thereafter, in *Kyriazis v. University of West Virginia*, 192 W. Va. 60, 450 S.E.2d 649 (1994), the plaintiff, a student at West Virginia University, was required to sign a waiver of liability as a condition precedent to participating in an intramural rugby club. Despite the absence of a specific statute setting a standard of care, we found that the waiver was nonetheless unenforceable on grounds of public policy because the club was sponsored by a state university and thus constituted a public service, and the bargaining positions of the parties were wholly unequal.[10] Relying upon *Murphy*, 186 W. Va. at 314-15, 412 S.E.2d at 508-09, which in turn had relied upon the *Restatement (Second) of Contracts* § 195(2)(b)-(c) (1979), we held that

> [a] clause in an agreement exempting a party from tort liability is, however, unenforceable on grounds of public policy if, for example, (1) the clause exempts a party charged with a duty of public service from tort liability to a party to whom that duty is owed, or (2) the injured party is similarly a member of a class which is protected against the class to which the party inflicting the harm belongs.

*Kyriazis*, 192 W. Va. at 64-65, 450 S.E.2d at 653-54.

---

[10]"The University also admitted the Release was prepared by a lawyer in the Office of Counsel . . . [and i]f appellant wished to play club rugby for the University, he had no choice but to sign the Release." *Kyriazis*, 192 W. Va. at 66, 450 S.E.2d at 655.

Finally, in the recent case of *Finch v. Inspectech, LLC*, 229 W. Va. 147, 727 S.E.2d 823 (2012), the plaintiffs had purchased a home in reliance, in part, on an inspection performed and report prepared by Inspectech. The Inspectech contract, which the plaintiffs signed, contained an "Unconditional Release and Limitation of Liability" clause purporting to release the company from any liability for negligence. After the plaintiffs had purchased the home it was determined that there were structural problems affecting the house's foundation, which in turn resulted in substantial damage to the property. The plaintiffs sued Inspectech for negligence, and the circuit court granted summary judgment to the company on the ground that the "Unconditional Release" was a bar to the action.

On appeal, Inspectech contended that because it was a private business entity, it could freely contract to relieve itself of future liability. This court disagreed with this sweeping assertion. We found that in *Finch*, as in *Murphy*, the Legislature had enacted statutory standards of care[11] "with which home inspectors are expected to comply in performing home inspections and in preparing reports for their clients." *Finch*, 229 W. Va. at __, 727 S.E.2d

---

[11]W. Va. C.S.R. § 87-5-1 *et seq*. Citing syllabus point four of *State ex rel. Callaghan v. West Virginia Civil Service Commission*, 166 W. Va. 117, 273 S.E.2d 72 (1980), we concluded that a standard contained in a legislative rule was the equivalent of a standard contained in a statute, since "[p]rocedures and rules properly promulgated by an administrative agency with authority to enforce a law will be upheld so long as they are reasonable and do not enlarge, amend or repeal substantive rights created by statute." *Finch*, 229 W. Va. at __ n.5, 727 S.E.2d at 832-33 n.5.

at 833. Thus, pursuant to the Court's holding in *Murphy*, Inspectech's release of liability violated public policy and was unenforceable.

Again we turn to the facts of the instant case. Here, Perfection Plus' services were not governed by a statutory standard of care, as in *Murphy* and *Finch*, and it cannot be said that the company is "an enterprise charged with a duty of public service," as in *Kyriazis*.[12] Further, and significantly, Perfection Plus contracted to do one thing: to provide cleanup and restoration services for an agreed-upon price. Under the terms of the contract, Perfection Plus did not attempt to disclaim liability for its failure to competently provide the very services it was contracting to perform[13]; to the contrary, the waiver of liability in the Perfection Plus contract encompassed only those services that the company was specifically *not* contracting to perform: detection and/or remediation of mold. We are aware of no public policy that requires a private business entity to assume liability for work or services that it does not perform, where, as here, it has given the customer notice that it does not perform the services, has provided information to the customer as to what entities do perform them, and has advised the customer to consult such entities.

---

[12]*Kyriazis*, 192 W. Va. at 66, 450 S.E.2d at 655.

[13]*Cf. Finch,* 229 W. Va. at __, 727 S.E.2d at 835 ("Moreover, the specific terms of the 'Unconditional Release and Limitation of Liability' clause of the parties' Inspection Agreement expressly attempt to relieve Inspectech of liability attributable to its inspection of the house the Finches requested it to inspect[.]").

In the absence of a statutory standard of care and because Perfection Plus is not engaged in a public service, we conclude that the waiver of liability for mold-related damage in the company's contract did not violate public policy under our precedents.[14]

## IV.  CONCLUSION

The judgment of the Circuit Court of Randolph County is affirmed.

Affirmed.

---

[14]Inasmuch as we have affirmed the circuit court's ruling that the contractual waiver of liability in the Perfection Plus contract was a complete bar to the Pingleys' suit against the company, it is unnecessary for this Court to consider the circuit court's alternative ruling that the case was barred by the statute of limitations.